STAR TRANSFER LINE v. GENERAL EXPORTING CO.

1. Appeal and Error—Interpleader—Review De Novo.
    In reviewing decree rendered in interpleader suit, the Supreme Court considers the case *de novo*.

2. Courts—Jurisdiction—Title of Imported Whisky in Bond—Warehouse Receipts.
    A State court had jurisdiction of warehouseman's interpleader suit to determine, as between buyer and seller, title to imported whisky in bond and warehouse receipts issued therefor where such court carefully refrained from interference with rights and powers of the United States collector of customs and decree expressly protected collection of customs duties and internal revenue taxes due the United States.

3. Same—Superior Court of Grand Rapids—Jurisdiction—Equity.
    The superior court of Grand Rapids has jurisdiction in equity cases if any of the parties to the suit reside in Grand Rapids (3 Comp. Laws 1929, § 16351).

4. Same—Superior Court of Grand Rapids—Corporations.
    Under statute defining jurisdiction of superior court of Grand Rapids it has jurisdiction of interpleader suit filed by domestic corporation with office and principal place of business in the city (3 Comp. Laws 1929, §§ 13944, 16351).

---

Agents holding a title, see 2 Restatement, Agency, § 423; acting adversely to principal, see 1 Restatement, Agency, § 282.

5. INTERPLEADER—WAREHOUSEMEN—JURISDICTION.

Since State chancery courts have jurisdiction of interpleader suits filed by parties domiciled in the State having custody or possession of property claimed by two or more adverse claimants, suit may be brought in court of county in which custodian resides (3 Comp. Laws 1929, § 13944).

6. COURTS—JURISDICTION—COLLATERAL ATTACK—FEDERAL COURT.

Jurisdiction already assumed and exercised under State law by a State court is not subject to collateral attack in Federal district court.

7. DEPOSITIONS—PREVIOUS EXAMINATION OF INTERROGATORIES BY DEPONENT.

The deposition of a witness is not invalidated by the fact that before testifying the witness was furnished with or read the interrogatories and cross-interrogatories in advance of his examination, where no attempt was made or influence brought to bear on him to affect his testimony and the party complaining has not been prejudiced.

8. SAME—PREVIOUS EXAMINATION OF INTERROGATORIES—REFRESHING RECOLLECTION.

Deposition which was taken in pursuance of letters rogatory was not improperly taken and, except as to certain interrogatories and answers stricken, was admissible in evidence, notwithstanding that it appears deponent was furnished with a copy of the written interrogatories prior to the taking of the deposition and, while giving deposition, to refresh memory, frequently referred to memoranda he had prepared, where the certificate of the commissioner before whom the deposition was taken recited that deponent had stated his records had been entirely destroyed and that commissioner had no reason to believe deponent's written notes referred to anything not within his personal knowledge.

9. SAME—RECORD.

Action of trial court in striking certain interrogatories propounded to deponent and certain of his answers under letters rogatory and admission of remainder *held,* proper under record presented.

10. CARRIERS—BILL OF LADING—ORDER OF SHIPPER—TITLE.

A bill of lading which provides for delivery to the order of the shipper indicates an intention to reserve title in the shipper.

11. SAME—BILL OF LADING—TITLE—INTENT.

In the last analysis whether or not title passes by a bill of lading is a matter of intention.

12. SAME—BILL OF LADING—ORDER OF SHIPPER—TITLE—PRINCIPAL AND AGENT.

The prima facie conclusion that the vendor reserves the *jus disponendi* when the bill of lading is to his order may be rebutted by proof that he acted as agent for the vendee, thereby raising a question of fact.

13. SAME—BILL OF LADING—INTENT.

As between the consignor and consignee the bill of lading cannot be regarded as a contract in writing, but merely as a rebuttable admission or declaration by consignor as to his purpose at the time in making the shipment.

14. SALES—TITLE—EVIDENCE—INVOICES FOR CUSTOMS PURPOSES.

Invoices by shipper of whisky from England, not licensed to import liquor into the United States, which were on consular service forms apparently for customs purposes stating terms and that it was by order and for account and risk of another and adverse defendant in interpleader suit who was a licensed importer were admissible in evidence as bearing upon the intent of the parties but not conclusive of the question as to whether or not title to the whisky passed to such other defendant.

15. INTOXICATING LIQUORS—IMPORTS—TITLE—BASIC PERMIT—INTERPLEADER.

Fact that shipper of whisky from England did not have a basic permit to import liquor into the United States would not preclude it from asserting title to the whisky in bonded warehouse as against claim of ownership by adverse defendant in interpleader suit which had such a permit and to whom shipper had sent whisky under alleged agency arrangement.

16. SAME—IMPORTS—TRANSFER OF TITLE—INTERPLEADER.

In warehouser's interpleader suit as between shipper of whisky from England and defendant which shipper claims was its agent, the fact that shipper did not have a basic permit to import liquor into the United States would not operate to transfer title to other defendant in whose account and to whose order the whisky had been sent.

17. CORPORATIONS—STATUTES—TITLE OF PROPERTY—PRINCIPAL AND AGENT.

Where the principal object of a statute is to bring foreign corporations within reach of legal process and subject them to the taxing power of the State, it would not necessarily deny to them the right of ownership of property, effect a for-

feiture thereof, or work a conversion of title to the agent in whose possession the property may be even though the corporation were doing business in violation of statute.

18. INTERPLEADER—TITLE OF IMPORTED WHISKY—EVIDENCE.

In warehouser's interpleader suit to determine title to whisky and warehouse receipts issued therefor, record required holding that Illinois corporation which had a basic permit to import liquor received and stored it as agent of English corporation which did not have such a permit and that latter corporation retained title.

19. WAREHOUSEMEN—UNIFORM ACT—BONA FIDE PURCHASERS.

The uniform warehouse receipts act does not appear to have intended to change or modify a previously-existing well-defined definition or rule as to what constitutes a bona fide purchaser of a warehouse receipt (2 Comp. Laws 1929, § 9604; § 9610, as amended by Act No. 180, Pub. Acts 1933; § 9620).

20. SAME—OWNERSHIP OF IMPORTED WHISKY—NEGOTIATION OF RECEIPT—GOOD-FAITH PURCHASER.

Where it appears that an Illinois corporation, defendant in bonded warehouser's interpleader suit, which had stored imported whisky with plaintiff, acted as agent for defendant English corporation that did not have a basic permit to import liquor into the United States, and transferred warehouse receipt to a third defendant who is found not to have taken the receipt either as security for, or as an absolute assignment for the payment of, a loan, the English corporation is sole owner of both the whisky and the receipt issued therefor (2 Comp. Laws 1929, § 9604; § 9610, as amended by Act No. 180, Pub. Acts 1933; § 9620).

21. INTOXICATING LIQUORS—BONDED WAREHOUSE—INTERPLEADER—LIENS.

Ownership of imported whisky stored in plaintiff's bonded warehouse is subject to liens or claims of United States government for customs duties and taxes thereon and lien of warehouser for storage charges and fees and expenses in connection with trial and appeal in interpleader suit.

22. INTERPLEADER—INTOXICATING LIQUORS—WAREHOUSE STORAGE CHARGES—FEES AND EXPENSES—COSTS.

Defendant agent and his transferee of negotiable warehouse receipt for imported liquor stored in plaintiff's bonded warehouse *held,* not personally liable to plaintiff warehouser for storage charges or its attorney fees and expenses except costs

in interpleader suit upon determination that title to the whisky and receipts was in defendant principal, an English corporation.

23. SAME—INJUNCTION—TERMINATION OF LITIGATION.

In bonded warehouser's interpleader suit which was one of four suits involving title to imported whisky and warehouse receipts therefor, injunction against commencement or prosecution of any other suit by party to whom receipts were issued and the person to whom they were subsequently transferred is issued to terminate the litigation.

Appeal from Superior Court of Grand Rapids; Taylor (Thaddeus B.), J. Submitted November 26, 1943. (Docket No. 98, Calendar No. 42,404.) Decided February 24, 1944. Rehearing denied April 7, 1944. Certiorari denied by the Supreme Court of the United States October 9, 1944.

Bill of interpleader by Star Transfer Line, a Michigan corporation, against General Exporting Company, an Illinois corporation, John J. McKeown and Southard & Company, Ltd., an English corporation, to determine the title to some cases of whisky. Decree for defendant Southard & Company, Ltd. Defendants General Exporting Company and John J. McKeown appeal. Modified and affirmed.

*Warner, Norcross & Judd* and *Joseph Shulsky,* for plaintiff.

*Maxfield Weisbrod* (*Willard McIntyre,* of counsel), for defendant General Exporting Company.

*Cummings & Wyman* and *Daniel P. Nagle,* for defendant Southard & Company, Ltd.

*Abner Dilley,* for defendant McKeown.

STARR, J. Plaintiff Star Transfer Line instituted this interpleader suit for the purpose of determining

title to 799 cases of imported Scotch whisky stored in its bonded warehouse in Detroit. Defendants General Exporting Company and John J. McKeown appeal from a decree determining defendant Southard & Company, Ltd., to be the owner of such whisky and the warehouse receipt therefor. This being a chancery case, we consider the same *de novo*.

Plaintiff is a Michigan corporation engaged in business as a public warehouseman under 2 Comp. Laws 1929, § 9623 *et seq.* (Stat. Ann. § 19.491 *et seq.*), and maintains a warehouse in the city of Detroit. Defendant Southard & Company, Ltd. (herein referred to as Southard), a British corporation with its principal offices in London, England, is engaged in the business of exporting whisky, wine, and other liquors. Defendant McKeown, a resident of Chicago, Illinois, is engaged in the wholesale bakery business and also in the operation of "currency exchanges." Defendant General Exporting Company (herein referred to as General Exporting), an Illinois corporation with its principal office in Chicago, was engaged in the business of importing and selling whisky and other liquors. General Exporting was organized about 1934 by one Benjamin I. Salinger, Jr., a Chicago attorney, and the record clearly indicates that it was a dummy corporation controlled and dominated by Salinger for the purpose of conducting his liquor business. All the capital stock of General Exporting was held by its secretary and treasurer, Helen Booker, also known as M. H. Booker, who was Salinger's secretary and who later became his wife. George Witt, one of the original incorporators and president of General Exporting until about March, 1938, testified in part:

"There never was any directors meeting. There never were any directors. * * * Salinger was not an officer or director of General Exporting. * * *

. "I was the 'dummy' president of the corporation. Doing just what Salinger told me to do.    *    *    * He was the whole works.    *    *    *    He was the corporation."

At the time of the transactions involved in the present case, one C. D. Gallagher was president of General Exporting.

While Salinger and his secretary Booker were in London in 1936, he interviewed Leonard Chambers, a director of Southard. Such interviews resulted in a written contract between Southard and General Exporting whereby the latter was to act as agent for Southard's liquors in certain specified territory in the United States. Chambers, whose deposition was taken in London, testified regarding such contract in part as follows:

"I believe it was the summer of 1936 I first met Benjamin I. Salinger.    *    *    *    The purpose of this    *    *    *    interview was in reference to negotiation of an order to be placed by the Iowa liquor control board with Southard & Company in which Salinger was to be the agent.    *    *    *

"The gist of the conversations    *    *    *    were efforts on the part of Salinger to convince me that he was in a position to influence a considerable volume of business in the United States if I would have sufficient confidence in him and appoint him as an agent for Southard.    *    *    *

"Southard & Company entered into business relations with General Exporting Company in the year 1936.    *    *    *

"There was an unwillingness, if not an actual inability on the part of the General Exporting Company and Salinger, to invest money in merchandise shipped by Southard.    *    *    *

"The original contract between Southard & Company and General Exporting Company had been the usual form of agency contract between a prin-

cipal and agent; it gave exclusive representation in certain specified areas; it reserved the right to the principals either to accept or decline business offered by the agent.   *   *   *   Salinger. appended his signature to the original and counterpart of the contract, signing as 'duly constituted attorney.' "

In pursuance of such contract, Southard continued its business relations with General Exporting until the spring of 1940.  In April of that year Chambers, representing Southard, went to Chicago to secure an accounting from General Exporting as to the amount of liquor in warehouses and as to charges and remittances for liquor shipped.  Being unable to get satisfactory information from Salinger, who pleaded illness and other excuses, Chambers interviewed Helen Booker, secretary and treasurer of General Exporting, who previous to that time had married Salinger.  She assisted Chambers in obtaining payment for previous shipments to General Exporting and also endeavored to assist him in obtaining from Salinger the warehouse receipts for certain whisky stored in Chicago and for the whisky in question stored in plaintiff's warehouse in Detroit.  Being unable to obtain such warehouse receipts, Mrs. Salinger referred Chambers to her Chicago attorneys.

About May 29, 1940, Southard began suit (herein referred to as the Illinois suit) against General Exporting and Benjamin Salinger in the district court of the United States for the northern district of Illinois to recover the above-mentioned whisky and warehouse receipts.  An order was entered in the district court restraining General Exporting and Salinger from assigning or disposing of the warehouse receipts and appointing one Arthur L. Schwartz as receiver thereof.  General Exporting and Salinger appealed from such restraining order.

The circuit court of appeals, seventh circuit, in its opinion rendered January 29, 1941, held that the district court's restraining order, having been granted without notice, expired within 10 days after entry. See *Southard & Co., Ltd.,* v. *Salinger* (C. C. A.), 117 Fed. (2d) 194. In December, 1940, Southard had filed a petition in the Illinois suit alleging in substance that the warehouse receipt for the whisky stored in Detroit had been assigned to and was in the possession of John J. McKeown, and asking that he be made a party defendant. In pursuance of such petition, an order was entered making McKeown a party defendant. He then filed answer claiming that prior to the institution of the Illinois suit, General Exporting, for a valuable consideration, had assigned and delivered to him the warehouse receipt covering the whisky stored in Detroit and that he was the owner of such receipt and whisky. The record indicates that no further action has been taken in such suit, and apparently the same is still pending but dormant.

About December 21, 1940, defendant McKeown began a chancery suit in the circuit court for Wayne county, Michigan, against Star Transfer and General Exporting as defendants, but did not make Southard a party defendant. In his bill of complaint McKeown alleged in substance that General Exporting had assigned and delivered to him the warehouse receipt issued by Star Transfer covering the 799 cases of whisky in its Detroit warehouse. He asked that he be decreed to be the owner of such warehouse receipt and whisky and that Star Transfer deliver the whisky to him upon payment of storage charges. Star Transfer filed answer denying McKeown's right to the relief sought. It also filed motion to dismiss such suit on the ground of prior suit pending in the district court of Illinois. General

Exporting answered, admitting that on April 27, 1940, it had assigned and delivered the warehouse receipt in question to plaintiff McKeown and that he was entitled to the relief sought. Apparently such suit is still pending but dormant.

On January 22, 1941, while the Illinois and the Wayne county suits were pending, Star Transfer, in pursuance of the provisions of the uniform warehouse receipts act (2 Comp. Laws 1929, §§ 9580, 9581 [Stat. Ann. §§ 19.437, 19.438]), began the present interpleader suit in the superior court of Grand Rapids against General Exporting, McKeown, Southard, and Schwartz, receiver, as defendants. In its bill of complaint plaintiff alleged in substance that the whisky in question had been stored in its Detroit warehouse and negotiable warehouse receipt issued to defendant General Exporting; that suits involving title to such whisky and warehouse· receipt were pending in the United States district court in Illinois and in the circuit court for Wayne county in chancery; that in the Illinois suit defendant Schwartz had been appointed receiver for such warehouse receipt; and that it was unable to ascertain which of the defendants was lawfully entitled to the receipt and whisky. Plaintiff asked that the court determine the ownership of such whisky and warehouse receipt. It also asked that, in addition to its lien for storage charges, it be given a lien for its reasonable costs, expenses, and attorney fees, in connection with such interpleader suit. Defendant Schwartz did not appear, and his default was duly entered. Defendant McKeown answered, asserting title to the warehouse receipt and the whisky in question, and by cross bill asked that the court decree him to be the owner of said receipt and whisky. General Exporting answered, alleging in substance that it had purchased the whisky in question from

defendant Southard; that it owned such whisky at the time it was stored in plaintiff's warehouse; that it had assigned and transferred the warehouse receipt to defendant McKeown; and that McKeown was the owner of such receipt and whisky. Defendant General Exporting also contended that the superior court of Grand Rapids was without jurisdiction to entertain such interpleader proceedings or to determine title to the whisky. Southard filed answer asserting that it was the owner of the whisky; that title thereto had never passed to defendant General Exporting; and that General Exporting had stored such whisky and obtained the warehouse receipt as its agent. Southard also alleged that General Exporting had assigned the warehouse receipt to defendant McKeown without consideration and as a subterfuge for the purpose of defeating Southard's claim of title to such receipt and whisky. Southard asked that it be decreed to own the warehouse receipt and whisky and that the whisky be delivered to it upon payment of plaintiff's storage charges and expenses.

Trial was begun in superior court on November 5, 1941, and during trial the court ordered the warehouse receipt, which was introduced in evidence by defendant McKeown, to be impounded and held by the clerk of the court. During an adjournment of the trial, defendants General Exporting and McKeown filed motions to dismiss the entire proceedings on the ground that the court was without jurisdiction to adjudicate title to the whisky which, they alleged, was in the custody of the United States government. Such motions were denied. Motions by defendants General Exporting and McKeown to exclude certain depositions presented by defendant Southard were also denied.

On May 5, 1942, the trial court filed opinion determining that defendant Southard was the owner

of the warehouse receipt and whisky in question. On May 19, 1942, subsequent to the filing of such opinion, but prior to the entry of decree on July 6, 1942, General Exporting "as consignee and for the benefit of John J. McKeown" began suit in the United States district court for the eastern district of Michigan against Star Transfer, the United States collector of customs at the port of Detroit, and Judge Thaddeus B. Taylor of the superior court of Grand Rapids. Defendant Southard was not made a party defendant in such suit. In its bill of complaint General Exporting alleged that McKeown was the owner of the warehouse receipt and whisky in question, and that the superior court of Grand Rapids was without jurisdiction or authority to determine the title or ownership of said whisky. It asked that Judge Taylor be enjoined "from taking any further proceedings" in the present interpleader suit pending before him, and that all proceedings in the superior court "be declared null, void and of no effect." Star Transfer and Judge Taylor filed motion to dismiss such suit on the grounds that the complaint failed to state a cause of action; that the Federal district court had no jurisdiction and should not enjoin a State court of co-ordinate jurisdiction; that another suit was pending between the same parties in the superior court of Grand Rapids; and that the commencement of such suit was in violation of the superior court's injunction. Following a hearing the district court entered decree dismissing the suit. General Exporting then appealed from such decree to the United States circuit court of appeals for the sixth circuit.

On June 4, 1943, pending the present appeal from the superior court of Grand Rapids, the circuit court of appeals entered opinion affirming the dismissal of the Detroit district court suit (*General Export-*

*ing Co.* v. *Star Transfer Line,* 136 Fed. [2d] 329, rehearing denied August 31, 1943). As such opinion determines certain questions raised in the present appeal, we shall quote at some length therefrom, pp. 332, 333:

"Appellant contends that a Federal court, alone, possesses jurisdiction to determine title to and ownership of whisky in bond; and that the superior court of Grand Rapids, Michigan, was not vested with jurisdiction and could exercise none to adjudge the title and ownership of the 799 cases of whisky involved in this controversy.   *   *   *

"The superior court of Grand Rapids carefully refrained from interference with the rights and powers of the United States collector of customs and, in its decree, expressly protected collection of the customs duties and internal revenue taxes due the United States so as not in any manner to disturb the position of the government. Both principle and authority support the jurisdiction of the Michigan trial court, properly invoked, to adjudicate, as between buyer and seller, the title to the whisky and the warehouse receipts.

"No merit is found in the argument of appellant that under Michigan statutes, the superior court of Grand Rapids is only a municipal court, possessing no equity jurisdiction of the character which it exercised in entertaining the interpleader suit of the Star Transfer Line, wherein title to the whisky and warehouse receipts was determined. In *Stowell* v. *Johnson,* 280 Mich. 627, 630, the Supreme Court of Michigan declared that the statute governing the jurisdiction of the superior court of Grand Rapids is 3 Comp. Laws 1929, § 16351 (Stat. Ann. § 27.3623), which provides that the superior court has jurisdiction 'of all equity suits   *   *   *   in which any complainant or defendant shall be resident of said city, or in which the subject matter of such suit is situate in said city;' and that this statute clearly confers

jurisdiction upon the superior court in equity cases, if any of the parties to the suit reside in Grand Rapids. The United States district court has found upon evidence that the office and principal place of business of the appellee, Star Transfer Line, is in the city of Grand Rapids. That Michigan corporation was, therefore, privileged under Michigan law to file its interpleader suit in the superior court of Grand Rapids.

"The Michigan statute, *supra,* confers upon the superior court of Grand Rapids original jurisdiction, concurrent with the circuit court of Kent county, of all equity cases in which either party is a resident of Grand Rapids. All Michigan circuit courts in chancery have jurisdiction to hear and determine suits begun by bills of interpleader, filed by any individual or corporation domiciled in Michigan having in its custody or possession property to which there are two or more adverse claimants. Such interpleader suit may be brought in the circuit court in chancery of the county in which the custodian of the property resides (3 Comp. Laws 1929, § 13944, subd. 7, as amended by Act No. 41, Pub. Acts 1939 [Comp. Laws Supp. 1940, § 13944, Stat. Ann. 1943 Cum. Supp. § 27.545]). The circuit court (superior court) of Grand Rapids, being vested with concurrent jurisdiction with the circuit court of Kent county, had a concurrent right to entertain the interpleader bill filed by the appellee.

"It may be added that jurisdiction already assumed and exercised under State law by a State court is not subject to collateral attack in a Federal district court. See *Mutual Reserve Fund Life Association* v. *Phelps,* 190 U. S. 147, 159, 160 (23 Sup. Ct. 707, 47 L. Ed. 987); *Kohn* v. *Central Distributing Co.,* 306 U. S. 531, 534 (59 Sup. Ct. 689, 83 L. Ed. 965)."

The contentions of defendants General Exporting and McKeown in the present appeal, that the superior court of Grand Rapids was without jurisdic-

tion to entertain the interpleader suit and to determine title to the warehouse receipt and whisky in question, were fully answered and adversely determined by the above-quoted opinion of the circuit court of appeals.

Defendants General Exporting and McKeown contend that the deposition of Leonard Chambers, a director of defendant Southard, should have been excluded and suppressed, because he was furnished with a copy of the written interrogatories prior to the taking of his deposition and that in giving his deposition he "frequently referred for the purpose of refreshing his memory" to memoranda or answers which he had prepared. Such deposition was taken upon interrogatories and cross-interrogatories in London before a commissioner, vice-consul of the United States, in pursuance of letters rogatory issued by the judge of the superior court of Grand Rapids. In his certificate the commissioner said in part:

"He (Chambers) stated that he had to rely completely on his memory, and that his records, to which many of the interrogatories referred, had been entirely destroyed, and they involved a period of some five years. There was no reason to believe that Mr. Chambers' written notes referred to anything that was not within his personal knowledge."

In 26 C. J. S. p. 888, § 67, it is stated:

"Prior information of witness. The deposition is not invalidated by the fact that before testifying the witness was furnished with or read the interrogatories and cross-interrogatories in advance of his examination, where no attempt was made or influence brought to bear on him to affect his testimony, and the party complaining has not been prejudiced."

See, also, *Allen* v. *Seyfried,* 43 Wis. 414; *Warner* v. *Daniels,* 1 Woodb. & M. 90 (Fed. Cas. No. 17,181); *Amee* v. *Wilson,* 22 Me. 116; *North Carolina R. Co.* v. *Drew,* 3 Woods, 691 (Fed. Cas. No. 17,434).

We are satisfied that witness Chambers' deposition was not improperly taken and, except as to certain interrogatories and answers stricken, was admissible in evidence.

During the trial defendant General Exporting filed written motion to strike certain of the interrogatories propounded to witness Chambers and certain of his answers. The trial court struck certain of the interrogatories and answers objected to and admitted the remainder. From examination of the record we conclude that such action by the trial court was entirely proper. Other objections of defendants General Exporting and McKeown to the Chambers deposition and to other depositions presented by defendant Southard are without merit.

Southard contends that it retained title to the whisky in question and that General Exporting stored such whisky and received the warehouse receipt as its agent. General Exporting denies that it was Southard's agent. It contends that it purchased the whisky from Southard; that it received and held title thereto; and that it owned the warehouse receipt issued by plaintiff. It further contends that it sold and assigned the warehouse receipt to defendant McKeown in consideration of the cancellation of its indebtedness to him in the amount of about $5,000, and that McKeown thereby became the absolute owner of such receipt and whisky. Therefore, we must first determine whether defendant Southard or defendant General Exporting owned the whisky at the time it was stored in plaintiff's warehouse.

Southard's offices, books, records, and its copy of the contract with General Exporting were destroyed on May 10, 1941, as a result of direct hits by enemy bombs. General Exporting claims that its copy of such contract was delivered by its secretary to Chambers in the spring of 1940. In any event, the contract was not put in evidence, and the relationship between the parties and the question of title to the whisky must be determined from the testimony and exhibits presented. Defendants General Exporting and McKeown argue that the bills of lading and invoices covering the whisky show that General Exporting purchased it from Southard and received title thereto.

Witness Chambers, a director of Southard, whose testimony is hereinbefore quoted in part, stated that the contract made in 1936 appointed General Exporting as agent for Southard. George Witt, president of General Exporting until 1938, testified that "General Exporting Company was an agent for anybody that we done business with, not only Southard but all other liquor houses.  *  *  *  We acted as agents for Southard & Company."

Southard did not have a basic permit for importing liquor into the United States. However, General Exporting had obtained such a permit, entitling it to import liquor shipped by Southard. In many instances orders for liquor obtained by General Exporting were sent to Southard which shipped directly to the customers, made collections, and then remitted commissions to General Exporting. In other instances Southard made shipments of stocks of liquor, which were placed in warehouses and from which General Exporting withdrew stock as it was sold, made collections, retained its commissions, and remitted the base or net price to Southard. As to all these transactions, witness Chambers, who had

charge of the export business for Southard, testified that "General Exporting Company has never been anything but agents for Southard & Company, nor did they want to be anything but agents, because of lack of funds." He testified regarding interviews with Salinger in 1939 in part as follows:

"During the course of conversations in London in the summer of 1939 he (Salinger) was most insistent that because of the imminence of war Southard & Company, Ltd., should build up substantial stocks or reserves of whisky in America, where it would be safe and where he could have the use of this whisky for drawing upon from time to time as required in his capacity as agent and in soliciting business in particular from State liquor control boards. It was his view, as propounded during these conversations, that such stocks should be held in the United States by Southard & Company, Ltd., as the principal, because it was their good will and their merchandise that he was developing, or attempting to develop, as an agent, and that it would be unfair or unduly burdensome upon him as an agent to have to finance such business.   *   *   *

"Southard & Company agreed, at the suggestion of Salinger, that they would from time to time make shipments to the United States of America on the authority of Salinger, and consign to the General Exporting Company, but not for payment by them, such stock being merely available on the spot for quick delivery as and when the General Exporting Company as agents received orders from State boards to make deliveries.

"It should be pointed out that the extent or frequency of these orders was never known in advance, so that the creation of some small reserve for quick delivery was obviously the only practical course, unless the General Exporting Company were willing to make purchases on their own accounts, which they were not. To facilitate the business, such stocks

placed in what I believe are referred to as field warehouses, had to be consigned to some one or body. * * *

"As to the remuneration to General Exporting Company, the method generally adopted was for the shipper to advise his agent of the base or net price that he required for his merchandise, and to give the agent liberty to arrange the price to the ultimate buyer, such price being a matter of negotiation. The difference between the base price agreed upon with the agent and the price quoted to the ultimate buyer would be credited to the General Exporting Company when the principals were placed in funds."

Two hundred cases of the whisky in question were shipped by Southard in October, 1939, on bill of lading which provided that it was to be delivered "to order or to his or their assigns * * * notify— the General Exporting Company." The remaining 600 cases were shipped by Southard in January, 1940, on bill of lading which provided "consigned to order of Messrs. Southard & Co. Ltd., notify the General Exporting Company." One case from the first shipment was lost or destroyed, leaving 199 cases which, together with the second shipment of 600 cases, comprise the 799 cases involved in the present suit. The bill of lading for the second shipment was indorsed in blank by Southard, but the bill for the first shipment does not appear to have been indorsed. Both bills of lading were sent to General Exporting, which received the whisky and stored it in plaintiff's warehouse. On April 20, 1940, plaintiff issued its negotiable warehouse receipt for such whisky to General Exporting.

As hereinbefore explained, Chambers was unable to obtain an accounting or satisfactory information from Benjamin Salinger in the spring of 1940. However, he obtained a written statement or certificate

of General Exporting, signed by its president and its secretary and treasurer, reading as follows:

"May 14, 1940.

"I, M. H. Booker, duly authorized secretary and treasurer of the General Exporting Company, Inc., an Illinois corporation doing business under the laws of the State of Illinois, do hereby certify that all stocks of Scotch whisky held in our name in warehouses in Chicago, Illinois, or in warehouses in the State of Michigan, or in any other warehouses in any other State, *are the property of Southard & Co., Ltd.,* London, England, and do further certify that said stocks were shipped by them in our care for their anticipated needs and estimated requirements, but *are not our property.*

"GENERAL EXPORTING COMPANY

"by M. H. BOOKER, Secretary and Treasurer

"Attest: C. D. GALLAGHER, President."

On May 27, 1940, General Exporting sent the following letter, signed by its president and its secretary and treasurer, to plaintiff Star Transfer:

"This is to advise you that the undersigned are the only officers of the General Exporting Co., Inc., and are the only persons authorized to indorse any warehouse receipts which you have issued.

"We further wish to call your attention to the fact that you have issued warehouse receipts bonds #88 and 132, for approximately 800 cases of whisky in the name of the General Exporting Co., Inc. *These are not now in our hands and are held against our wishes. Do not honor any indorsements on warehouse receipts other than the indorsements of the undersigned.*

"We will advise you further as to the disposition that we wish.    *    *    *

"GENERAL EXPORTING COMPANY, INC.

"By C. D. GALLAGHER, President

"M. H. BOOKER, Secretary-Treasurer."

The warehouse receipt in question was issued by plaintiff April 20, 1940. It is claimed that on April 27, 1940, General Exporting by Salinger as "counsel and duly authorized agent" and M. H. Booker, secretary, executed an assignment of such receipt to McKeown.

It should be noted that on May 14, 1940, about 18 days after such purported assignment to McKeown, General Exporting executed and delivered to Chambers the above-quoted certificate, signed by its president and by said M. H. Booker as secretary and treasurer, that the whisky in question was the property of Southard; also that on May 27th General Exporting notified plaintiff by letter that "these (warehouse receipts) are not now in our hands and are held against our wishes." Such letter also advised Star Transfer that C. D. Gallagher, president, and M. H. Booker, secretary and treasurer, "are the only officers of the General Exporting Co., Inc., and are the only persons authorized to indorse any warehouse receipts which you have issued." It is particularly significant that neither Benjamin Salinger, who was present in court, nor C. D. Gallagher, who signed both the certificate and letter above quoted, was called as a witness.

The attorney to whom Mrs. Salinger had referred Southard's director Chambers testified regarding his interviews with her on May 27 and 28, 1940, in part as follows:

"She (Mrs. Salinger) said that General Exporting had owed Southard & Company a great deal, that she herself, wanting to see that Southard & Company was taken care of, had paid Southard, or Chambers for Southard, $9,000. * * * That there was some cases of liquor which had been received in this country from Southard, and that there was one group of cases * * * in a warehouse in Detroit,

and one it seems to me were in Chicago.   *   *   *
That Southard & Company were entitled, in addition to the $9,000 that she had paid them,   *   *   *
to the liquor stored in those two warehouses.   *   *   *

"She said that Mr. Salinger, her husband, had the warehouse receipt.   *   *   *   That she was afraid he would negotiate them.   *   *   *

"She wanted me to represent Chambers to get this whisky for Southard & Company.   *   *   *   She said right at the start that this liquor belonged to Southard & Company."

Another attorney associated with the last abovementioned witness, who was present at the interviews with Mrs. Salinger on May 27th and 28th, testified in part:

"She (Mrs. Salinger) also said that certain liquor. was stored in two warehouses, Chicago and I believe Detroit, and that that liquor belonged to Southard & Company, but the warehouse receipts had been issued in the name of General Exporting Company, and her husband, Benjamin Salinger, had those warehouse receipts, and had failed to turn them over.   *   *   *

"She told us that there was just no question but what the warehouse receipts and liquor belonged to Southard, and that Mr. Salinger arbitrarily refused to surrender them,   *   *   *   and I remember that her greatest concern was to take action which would prevent Salinger from negotiating the warehouse receipts because she feared,   *   *   *   that if he were given time he would negotiate them or he might do something which would put it out of our power to recover the warehouse receipts from him.   *   *   *

"She told us at the first conference that General Exporting Company was the agent of Southard & Company in the sale of liquor here."

When called as a witness, Mrs. Salinger denied that General Exporting was agent for Southard and,

in effect, denied statements attributed to her by other witnesses that Southard was the owner of the whisky and warehouse receipt in question. She could not, or at least did not, satisfactorily explain her action in executing the purported assignment of the warehouse receipt to McKeown on April 27, 1940, and her signing of a certificate on May 14, 1940, that the whisky was the property of Southard.

Such whisky was shipped by defendant Southard to its order, "notify General Exporting Co." The law seems well established that a bill of lading which provides for delivery to the order of the shipper indicates an intention to reserve title in the shipper. In *Hamilton* v. *Jos. Schlitz Brewing Co.*, 129 Iowa, 172 (105 N. W. 438, 2 L. R. A. [N. S.] 1078), the court stated, p. 182:

"The doctrine of the cases (and many others might be cited to the same effect) is thus stated by Mr. Benjamin: 'The fact of making the bill of lading deliverable to the order of the vendor is, when not rebutted by evidence to the contrary, almost decisive to show his intention to reserve the *jus disponendi*, and to prevent the property from passing to the vendee.' Benjamin on Sales (1888), p. 333.

"As already stated, however, the question, in its last analysis, is one of intention; and 'the *prima facie* conclusion that the vendor reserves the *jus disponendi*, when the bill of lading is to his order, may be rebutted by proof that in so doing he acted as agent for the vendee, and did not intend to retain control of the property, and it is for the jury to determine as a question of fact what the real intention was.' Benjamin on Sales (1888), p. 333."

In *Thomas Emery's Sons* v. *Irving National Bank*, 25 Ohio St. 360, 365 (18 Am. Rep. 299), the court said:

"In all such transactions, the bill of lading is an important item of proof as to the intention, but it is not necessarily conclusive of the question.  If the bill of lading shows that the consignment was made for the benefit of the consignor or his order, it is very strong proof of his intention to reserve the *jus disponendi.* * * *

"As between the consignor and consignee, the bill of lading cannot be regarded as a contract in writing, but merely as an admission or declaration on the part of the consignor as to his purpose, at the time, in making the shipment, and such admission is subject to be rebutted by other circumstances connected with the transaction."

See *Sturges* v. *Detroit, G. H. & M. R. Co.,* 166 Mich. 231; *Bank of Litchfield* v. *Elliott,* 83 Minn. 469 (86 N. W. 454); *Hooper* v. *Railway Co.,* 27 Wis. 81 (9 Am. Rep. 439); 9 Am. Jur. p. 674.

In its assertion of title to the whisky, General Exporting places great stress upon Southard's invoices.  The record indicates that Southard prepared an invoice for each shipment on a form entitled, "American consular service at London," and headed, "invoice of purchased merchandise (for Great Britain)."  Such invoices bear the American consular certificate and also the declaration of Southard as shipper that the "merchandise is sold or agreed to be sold * * * and that it is intended to make entry of said merchandise * * * in the United States of America."  The invoices also indicate that the shipments were delivered "duty paid" and show a total basic price of approximately $18,000.  Such invoices were apparently for customs purposes in America.  Southard also prepared another form of invoice for each shipment, which stated in part: "Invoice of blended Scotch whisky

shipped by Southard & Company  *  *  *  by order and for account and risk of the General Exporting Co.  *  *  *  Terms, payment @ *45 days from date of invoice for withdrawals.*"

Although admissible in evidence as bearing upon the intent of the parties, such invoices are not conclusive of the question as to whether or not title to the whisky passed to General Exporting. The provision for payment "45 days from date of invoice for withdrawals" is entirely consistent with Southard's claim that, upon the request of Salinger, it was establishing stocks of whisky in American warehouses and that it retained title to such whisky, which could be withdrawn from time to time to fill orders obtained by General Exporting. In explanation of the bills of lading and invoices covering the whisky in question witness Chambers stated in part:

"The procedure between Southard & Company and the General Exporting Company as to bills of lading, invoices, warehouse charges and disbursements would vary somewhat with the circumstances attaching to various shipments, but in the present case (of the 799 cases), since the shipments had to be stored on arrival, it was necessary to send the bill of lading to the General Exporting Company or consign the merchandise to their order.  *  *  * This practice is universally recognized and has been employed by Southard & Company in various countries.  *  *  *

"The invoice in question was not in fact a sales invoice.  *  *  *  This invoice was prepared for customs purposes in America, and for purposes of record in the United Kingdom.  *  *  *

"It (bill of lading) was sent to General Exporting Company so that it might make arrangements for warehousing and take charge of the shipment on arrival. The purpose was to create a stock of whisky for prompt delivery, and was done because Salinger

always stressed the need to make prompt delivery.
* * *

"It (invoice) does not evidence a sale to General Exporting Company, nor does it disclose the terms of the arrangement of the shipment. * * *

"This invoice would not be an invoice for payment but for customs and record purposes."

A letter from General Exporting, signed by Benjamin Salinger, to the Illinois liquor control commission about February 14, 1940, indicates that liquor shipped by Southard and stored in American bonded warehouses was intended to remain the property of Southard. Such letter stated in part:

"Referring to our conference this afternoon in connection with an importing distributor's license, I inclose you herewith the order form on which we generally accept business in the United States. The general policy, is that remittances are direct to Southard & Company and *they in turn remit to us by credit memorandum or check for the commissions received.*

"*We have acted upon the assumption in Illinois as we have in other States that the liquor shipped from Southard & Company in bond was the property of Southard & Company until released and the duty paid.* * * * *Our position has been that all of the liquors while in bond remained the property of Southard & Company.*"

In determining that Southard retained title to the whisky in question and that General Exporting acted only as its agent, the trial court said in part:

"From the oral testimony, however, the court finds that it was agreed that the General Exporting Company of Chicago was to act as distributing agent for Southard & Company in the United States, and particularly in Illinois, Iowa and Michigan. Shipments of whisky were to be made to them as

agent only and they were to receive and store the whisky and then remit to Southard & Company within 45 days after they had consummated a sale.''

Defendants General Exporting and McKeown claim that, because defendant Southard did not have a basic permit to import liquor into the United States and had not complied with Federal and State statutes and regulations regarding the importation or sale of liquor, it could not, in the present interpleader suit, assert title to the whisky in question. Under the facts and circumstances shown, such claim is without merit. General Exporting was Southard's agent, and it had obtained a basic permit to import whisky. Furthermore, Southard was brought into this interpleader suit as a party defendant and was entitled to defend itself and, in defense, to assert its claim of title to the whisky and warehouse receipt. The fact that Southard did not have a basic permit or that it may not have complied with Federal or State statutes and regulations would not operate to transfer title to the whisky to defendant General Exporting. In the case of *Julius King Optical Co.* v. *Royal Insurance Co.,* 24 Pa. Sup. 527, the court said:

''The principal objects of the statute were to bring foreign corporations within reach of legal process and to subject them to the taxing power of the State. It was not intended to deny to them the right of ownership or to effect a forfeiture of title. Much less does it work a conversion of title to the agent of the corporation in whose possession the property may be. *Even if the corporation were engaged in doing business in violation of the statute, the property of the company in possession of the agent would still belong to it, and it could maintain an action against the agent for it.* 'While the courts

will not enforce an illegal contract yet if the servant or agent of another has in the prosecution of an illegal enterprise for his master received money or other property belonging to the master, he is bound to turn it over to him, and cannot shield himself from liability therefor upon the ground of the illegality of the original transaction.'"

See, also, *United States Express Co.* v. *Lucas,* 36 Ind. 361.

It is admitted that General Exporting never paid or offered to pay Southard for the whisky, which it now claims is owned by defendant McKeown. The record indicates that General Exporting has closed its office and discontinued its business.

A careful study of the record convinces us that Southard retained title to the whisky in question and that General Exporting received and stored such whisky with plaintiff and obtained the warehouse receipt therefor as agent for Southard.

A more serious question arises regarding the purported sale and transfer of the warehouse receipt by General Exporting to defendant McKeown. Both General Exporting and McKeown contend that title to the warehouse receipt and whisky represented thereby was sold and transferred to McKeown in payment of an indebtedness of about $5,000, which he claims General Exporting then owed him. Such warehouse receipt was negotiable, and the following provisions of the uniform warehouse receipts act are pertinent:

"A person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to the purchaser in good faith for value, and also such title to the goods as the depositor or per-

son to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey *to a purchaser in good faith for value;*

"(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him." 2 Comp. Laws 1929, § 9604 (Stat. Ann. § 19.461).

"The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was deprived of the possession of the same, by loss, theft, fraud, accident, mistake, duress, or conversion, *if the person to whom the receipt was negotiated,* or a person to whom the receipt was subsequently negotiated, *paid value therefor, in good faith, without notice* of the breach of duty, or loss, theft, fraud, accident, mistake, duress or conversion." 2 Comp. Laws 1929, § 9610 as amended by Act No. 180, Pub. Acts 1933 (Comp. Laws Supp. 1940, § 9610, Stat. Ann. § 19.467).

"A thing is done *'in good faith'* within the meaning of this act *when it is in fact done honestly,* whether it be done negligently or not." 2 Comp. Laws 1929, § 9620 (Stat. Ann. § 19.477).

Southard had placed the whisky in the possession of its agent General Exporting and had permitted it to store such whisky and obtain the warehouse receipt in its own name. Under the above-quoted provisions of the uniform warehouse receipts act, the question is whether or not defendant McKeown acted "honestly" in acquiring such warehouse receipt and whether or not he "paid value therefor, in good faith, without notice" of any defects or infirmities in General Exporting's title to such receipt or whisky represented thereby.

In determining title to a negotiable warehouse receipt for cotton placed in storage, in *City National Bank of Decatur* v. *Nelson,* 218 Ala. 90 (117 South. 681, 61 A. L. R. 938), the court said, p. 93:

"There was proof of such facts from which the jury could infer that the defendant could have easily ascertained that the cotton was subject to the plaintiff's lien, *facts which would have put a prudent man on inquiry and which if followed up would have disclosed the plaintiff's claim.* \* \* \*
"But it is contended, that this rule has been changed by the uniform warehouse receipt act and that a purchaser is protected, unless he has notice of the claim of another and is not chargeable with facts which would put a prudent man on inquiry, and which if followed up would lead to a discovery of the said claim. *We cannot agree to this contention, and do not think that the act in question was intended to change or modify a well-defined definition or rule as to what constitutes a bona fide purchaser.*"

See, also, *Commercial National Bank of New Orleans* v. *Canal-Louisiana Bank & Trust Co.,* 239 U. S. 520 (36 Sup. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917 E, 25).

The testimony of defendant McKeown is particularly important as bearing upon the question of his honesty and good faith in taking the warehouse receipt from General Exporting. He first testified in substance that he had loaned Benjamin Salinger money and that Salinger had given him the warehouse receipt as security; that Salinger was to sell the whisky and pay back such loans; and that he took Salinger's promissory note for about $5,000 and the warehouse receipt on the same day. He later testified that he purchased and owned the

warehouse receipt and was to receive the full proceeds from the sale of the whisky regardless of the amount of the note; that he was "going to make a couple of dollars on it;" and that he still held Salinger's note for approximately $5,000. Upon prompting, McKeown testified that he had loaned the money to General Exporting but added, "*I don't know who got the money.*" Later he testified in substance that he took the warehouse receipt from Salinger as security and that he was to get out of it "just what (he) had in it." McKeown introduced in evidence four promissory notes executed by General Exporting by M. H. Booker, aggregating $5,080. He testified that these notes represented loans that were paid in full by the assignment to him of the warehouse receipt. He had previously testified that such loans were made to Salinger, and it should be noted that the last of the four notes was dated April 20, 1940, the same day that the warehouse receipt was issued to General Exporting. However, McKeown apparently took a new note from Salinger for $5,080 at the same time that he took the warehouse receipt. We do not overlook the fact that the warehouse receipt, which McKeown claims he received in payment of Salinger's or General Exporting's indebtedness to him of $5,080, represented whisky which Southard had invoiced, duty paid, at a basic price of about $18,000. We shall quote a small portion of McKeown's testimony to show the confusion in his statements.

"*I had loaned him (Salinger) money from time to time.* * * *

"He certainly does owe me money—and *he gave me security for it.* * * *

"*It was up to Salinger* according to my agreement with him to pay, *to collect this money for me and pay me.* * * *

"*The Court:* * * * Do you mean that at the time this warehouse receipt was indorsed that *Mr. Salinger was indebted to you* * * * in the sum of approximately $5,000?

"*A.* That is right. * * *

"*The Court: And then on that day, he gave you that warehouse receipt and his promissory note for the total amount of what he owed you?*

"*A. That is right,* and also a letter that said he would sell the whisky, because I couldn't sell it. * * *

"That was my warehouse receipt. * * * As far as he (Salinger) is concerned, I was paid off. * * *

"*The Court:* How much of the whisky when it was sold were you supposed to receive?

"*A.* I was supposed to receive it all.

"*The Court:* Regardless of the amount of the note?

"*A. Yes, but I was going to make a couple of dollars on it there, you know.* * * *

"I was fool enough to take it in the first place because I didn't know that the whisky was in that kind of a warehouse. * * *

"I still hold a note (of Salinger's) for approximately $5,000."

On cross-examination by counsel for General Exporting, defendant McKeown further testified:

"*Q.* The money you loaned in question here was *money you loaned direct to the General Exporting Company?*

"*A.* In their office. * * *

"*Q.* But it was the General Exporting Company that got the money, wasn't it?

"*A. I don't know who got the money.*"

McKeown further testified in part:

"*Q.* You testified under oath a few moments ago that you still have a note for $5,000?

"*A.* That is it. * * *

"Yes, that is what I figure on getting, the amount of $5,080. * * *

"The first time I talked to Mr. Salinger or anyone in the corporation with respect to the warehouse receipt was when I wanted my money back on those notes and *he (Salinger) said 'John, I will secure you with this warehouse receipt,' and I said swell.*
* * *

"*I would only get out of it just about what I had in it, is the way I understood it from him.*

"*Q.* Then you say you took this warehouse receipt *as security* for the $5,080?

"*A.* That is right."

In its answer filed in the Illinois suit defendant General Exporting stated that the warehouse receipt in question was "negotiated and pledged as collateral."

We again call attention to the fact that neither C. D. Gallagher, president of General Exporting, nor Benjamin Salinger, who was present in court, was called as a witness. Mrs. Salinger's testimony that General Exporting owned the whisky and warehouse receipt and her testimony as to the regularity of the transfer of such receipt to McKeown April 27, 1940, must be considered in connection with the certificate which she signed on May 14, 1940, that Southard was the owner of the whisky. Her testimony must also be considered in connection with the statements attributed to her by witness Chambers and by her own attorneys to the effect that Southard was the owner of the whisky and warehouse receipt.

The testimony of defendant McKeown and of Mrs. Salinger is not convincing that McKeown acquired the warehouse receipt for value, in good faith, and without notice of defects or infirmities in the title of General Exporting to such receipt or the whisky

represented thereby. The trial court saw and heard defendant McKeown, Mrs. Salinger, and other witnesses and was in a better position to judge the credibility of and weight to be given their testimony. After examining the entire record, we are disposed to agree with the trial court, who said in part:

"The alleged delivery (of the warehouse receipt) was not in good faith, for value, and without notice. Mr. McKeown has failed, even with the assistance of the General Exporting Company, through the able efforts of Mrs. Salinger testifying in its behalf, to satisfy this court that he, McKeown, took this warehouse receipt either as collateral, security for a loan, or as an absolute assignment for the payment of a loan."

The fact that Southard did not have a basic importation permit or that it may not have complied with Federal and State statutes and regulations, would not operate to transfer title to such warehouse receipt to McKeown. See *Julius King Optical Co.* v. *Royal Insurance Co., supra; United States Express Co.* v. *Lucas, supra.* Other contentions by defendants General Exporting and McKeown regarding title to the whisky and warehouse receipt do not merit consideration.

Therefore, we conclude that defendant Southard is the owner of the 799 cases of whisky stored in plaintiff's warehouse and of the warehouse receipt therefor, and that neither defendant General Exporting nor defendant McKeown has any right, title or interest in or to such whisky and warehouse receipt. Such receipt, which was impounded by the trial court, shall be delivered to Southard. Its ownership of said whisky shall be subject to the liens or claims of the United States government for customs duties and taxes thereon, to the lien of Star Transfer for storage charges, and also to the lien

of Star Transfer for the fees and expenses of its attorneys incurred prior to this appeal in connection with the present interpleader suit, which were determined by the trial court to be $1,832.48.

Star Transfer shall also have a lien upon said whisky for its expenses and reasonable attorney fees incurred in connection with the present appeal, the amount of which shall be determined by the trial court.

The trial court's decree determined defendants General Exporting and McKeown to be personally liable to defendant Southard and plaintiff Star Transfer for plaintiff's storage charges accruing subsequent to the commencement of this suit on January 22, 1941, and also for the attorney fees and expenses incurred by plaintiff in connection with this suit. Under all the facts and circumstances, we believe that such provisions of the trial court's decree were inequitable and should be vacated and set aside. Defendants General Exporting and McKeown shall not be personally liable for any part of plaintiff's storage charges or for its attorney fees and expenses, except for costs as hereinafter provided.

Defendants General Exporting and McKeown shall, immediately on demand therefor, execute and deliver to Southard and/or to Star Transfer all such assignments, conveyances, releases, and other documents that may be necessary in order effectually to vest title to said whisky and warehouse receipt in defendant Southard and that may be necessary to enable said Southard or its assigns to sell or otherwise dispose of said whisky or warehouse receipt. In the event that either said General Exporting or McKeown shall fail, neglect or refuse to execute any such assignments, conveyances, releases or other documents referred to above, the decree to be entered in this court shall operate and be construed as effecting such execution.

In order to terminate the prolonged litigation over the whisky and warehouse receipt in question, said defendants General Exporting and McKeown and their attorneys, agents, representatives, and any person claiming by or through them shall be permanently enjoined from commencing or prosecuting any other suit or proceedings against said Star Transfer, Southard, and the customs authorities or agencies of the United States, involving title or claim to said whisky and warehouse receipt.

As we have determined Southard to be the owner of the whisky and warehouse receipt, the provisions of the trial court's decree authorizing Star Transfer to. sell said whisky are unnecessary and accordingly are vacated and set aside.

The decree of the trial court is affirmed except as amended, modified or changed by this opinion. A decree may be entered in this court in accordance with this opinion. Such decree shall provide for remanding the case to the trial court for determination of the reasonable attorney fees and expenses incurred by plaintiff in connection with this appeal and for such further proceedings and the entry of such further orders as may be necessary.

Plaintiff Star Transfer and defendant Southard shall recover their costs of both courts from defendants General Exporting and McKeown.

NORTH, C. J., and WIEST, BUTZEL, BUSHNELL, SHARPE, and BOYLES, JJ., concurred with STARR, J. REID, J., took no part in the decision of this case.