TAYLOR *v.* AUDITOR GENERAL.

1. Courts—Court of Claims—Jurisdiction.

The court of claims, under the provisions of the act creating it, has exclusive jurisdiction of claims and demands against the State, liquidated and unliquidated, *ex contractu* and *ex delicto*, previously determined by the board of State auditors and State administrative board (Const 1908, art 6, § 20; CL 1948, § 17.1 *et seq.;* § 691.101 *et seq.*).

2. Same—Restrictions—Jurisdiction.

The court of claims is a court of limited jurisdiction, a legislative court, and derives its powers only from the act of the legislature subject to the limitations therein imposed, and does not possess the broad and inherent powers of a constitutional court of general jurisdiction (CL 1948, § 691.101 *et seq.*).

3. Declaratory Judgment—Courts of Record.

The statute authorizing the rendition of declaratory judgments was not intended to authorize such judgments by any and all courts of record (CL 1948, § 691.501 *et seq.*).

4. Statutes—Intent.

The intent of a statute is gathered from a consideration of the act as a whole, not from some isolated clause thereof, or words of general import.

---

References for Points in Headnotes
[1] 49 Am Jur, States, Territories and Dependencies § 103.
[2] 14 Am Jur, Courts §§ 164, 169.
[3] 16 Am Jur, Declaratory Judgments § 4.
   Declaration of rights or declaratory judgments. 12 ALR 52; 19 ALR 1124; 50 ALR 42; 68 ALR 110; 87 ALR 1205.
[4] 50 Am Jur, Statutes § 306.
[5] 16 Am Jur, Declaratory Judgments § 4.
   14 Am Jur, Courts § 169.
[6] 3 Am Jur, Appeal and Error § 839.
[7] 11 Am Jur, Constitutional Law § 94.
[8] 43 Am Jur, Public Officers § 349.
[9] 30A Am Jur, Judges §§ 67, 68.
[10] 11 Am Jur, Constitutional Law § 49.
[11] 16 Am Jur, Declaratory Judgments § 75.

5. COURTS—COURT OF CLAIMS—DECLARATORY JUDGMENT.

The court of claims, being a court of limited jurisdiction hearing claims formerly heard by administrative boards and without an "equity side," is not authorized to render declaratory judgments (CL 1948, § 691.101 *et seq.*; § 691.501 *et seq.*).

6. APPEAL AND ERROR—QUESTIONS REVIEWABLE—JURISDICTION—RES JUDICATA—COLLATERAL ESTOPPEL.

The determination of a case upon a particular basis advanced by the appellee, namely, that the court from which the appeal had been taken did not have jurisdiction to make the determination sought by the appellant therein, and consequent failure to discuss other theories or doctrines advanced by the appellee, such as *res judicata,* or collateral estoppel, is not to be interpreted as an approval of appellee's action in instituting this proceeding.

7. COURTS—DETERMINATION OF ISSUES—CONSTITUTIONAL LAW.

A court does not grapple with a constitutional issue except as a last resort.

8. CONSTITUTIONAL LAW—SALARIES OF PUBLIC OFFICIALS—CHANGE DURING TERM OF OFFICE.

The constitutional invulnerability to changes in salaries of public officials during term of office, being founded upon interference with the judiciary through the power of the purse during the Revolutionary times, is not construed as effecting a violation of the equal protection clause of the Fourteenth Amendment, notwithstanding the result may be the payment of differing salaries to incumbents simultaneously sharing like responsibilities (Const 1908, art 16, § 3).

9. JUDGES—SUPERIOR COURT OF GRAND RAPIDS—CIRCUIT JUDGES—CONSTITUTIONAL LAW.

The judge of the superior court of Grand Rapids is not a "circuit judge," as that term is used in provision excepting "circuit judges" from prohibition in Constitution against increase of salaries after election or appointment (Const 1908, art 16, § 3).

10. CONSTITUTIONAL LAW—SUPREME COURT.

It is the duty of the Supreme Court to uphold as inviolate the State Constitution adopted by the people as it does not have the power to change the Constitution.

11. COSTS—PUBLIC QUESTION—COURT OF CLAIMS—DECLARATORY JUDGMENT.

No costs are allowed on appeal from order dismissing petition

for declaration of rights in court of claims, a public question being involved (CL 1948, § 691.101 *et seq.*; § 691.501 *et seq.*).

Black, J., dissenting.

Appeal from Court of Claims; Salmon (Marvin J.), J., presiding. Submitted January 6, 1960. (Docket No. 24, Calendar No. 48,271.) Decided June 6, 1960.

Claim by Thaddeus B. Taylor, former judge of the superior court of Grand Rapids, against State of Michigan, Frank S. Szymanski, auditor general, for additional salary. Claim amended to ask declaration of rights. Cause dismissed on motion. Plaintiff appeals. Affirmed.

*Thaddeus B. Taylor, in propria persona,* and *James K. Miller,* for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Russell A. Searl* and *Leon S. Cohan,* Assistants Attorney General, for defendants.

Smith, J. Here the plaintiff, formerly judge of the superior court of Grand Rapids, has sought, from the court of claims, a declaration of rights.

His declaration originally claimed damages in the sum of $27,228.46, plus interest. This sum was a total of various salary items allegedly due to, and wrongfully withheld from, plaintiff. As to them, he asserted, he had a vested right by virtue of his performance of the duties of judge of the superior court.

The defendant moved to dismiss upon 4 grounds: That the declaration did not state a cause of action; that the cause of action was barred by virtue of our order entered in a former proceeding brought by this plaintiff against the auditor general (*Taylor* v. *Au-*

*ditor General,* 342 Mich 265) ; and, finally, that some portions of the claim were outlawed by the statute of limitations, others by failure to institute action thereon or file notice of intent so to do within 1 year of their accrual.

Plaintiff thereafter struck the *ad damnum* clause from the declaration and inserted, in lieu thereof, a prayer for a declaration of rights under the statute.[1]

Defendant was thereupon permitted to add to its motion to dismiss the additional ground that "the court of claims does not have jurisdiction for a declaration of rights," which ground constituted the basis of the trial court's grant of defendant's motion to dismiss. This issue, then, the jurisdiction of the court of claims, confronts us at the threshold of the case.

The court of claims is a court of legislative creation. It came about in this way: the Constitution of 1908, in article 6, § 20, provided that the board of State auditors "shall examine and adjust all claims against the State not otherwise provided for by general law." In 1929, the State administrative board, which had been created in 1921,[2] was "vested with discretionary power and authority to hear, consider and determine claims presented to said board against the State of Michigan, arising from or by reason of negligence, malfeasance or misfeasance of any State officer, employee, * * * and to allow same and order payment thereof."[3]

The court of claims act was passed subsequently.[4] This act conferred upon the newly-created court of claims exclusive jurisdiction "over claims and de-

---

[1] CL 1948, § 691.501 *et seq.* (Stat Ann § 27.501 *et seq.*).

[2] PA 1921, No 2 (CL 1948, § 17.1 *et seq.* [Stat Ann 1952 Rev § 3.261 *et seq.*]).

[3] PA 1929, No 259 (repealed as obsolete by PA 1944 [1st ex sess], No 29.—REPORTER).

[4] CL 1948, § 691.101 *et seq.* (Stat Ann 1959 Cum Supp § 27.3548 [1] *et seq.*).

mands against the State or any of its departments, commissions, boards, institutions, arms or agencies."[5]

"In short," as we held in *Manion* v. *State Highway Commissioner,* 303 Mich 1, 20: "a 'court of claims' was substituted by the legislature for the 'board of State auditors' and the 'State administrative board' for the purpose of hearing and determining 'all claims and demands, liquidated and unliquidated, *ex contractu* and *ex delicto* against the State.'"

The court thus created was, as we have held, a court of limited jurisdiction. *Farrell* v. *Unemployment Compensation Commission,* 317 Mich 676. It derives its powers only from the legislative act of its creation and does not possess the broad and inherent powers of a constitutional court of general jurisdiction. *Manion* v. *State Highway Commissioner, supra.*

What, then, is its jurisdiction, as expressed in the act of its creation? We turn to section 8 of the statute:

"The court shall have power and jurisdiction:
"1. To hear and determine all claims and demands, liquidated and unliquidated, *ex contractu* and *ex delicto,* against the State and any of its departments, commissions, boards, institutions, arms or agencies."

The jurisdiction thus granted is narrow and limited, substituting, merely, a "court" of claims for the superseded claims jurisdiction of the earlier boards. The Michigan statute under which a declaration of rights is sought employs the terminology of the uniform act in its use of the term "courts of record" in authorizing the rendition of declaratory

---

[5] CL 1948, § 691.108 (Stat Ann 1959 Cum Supp § 27.3548[8]).

judgments.[6]   But analysis of the entire act makes it
clear that the statute does not authorize the rendition
of declaratory judgments by any and all "courts of
record."  We do not, of course, gather the intent of
a statute from some isolated clause thereof, or words
of general import, but from the act as a whole.
Those courts of record that are authorized to render
declaratory judgments are indicated in section 2 of
the act,[7] wherein it is provided that such declaration
of rights may be obtained "by means of a petition on
either the law or the equity side of the court."  The
court of claims has no "equity side" as that term is
employed in respect of the jurisdiction of Michigan
courts, it being, as we have pointed out, a legislative
court of limited jurisdiction to which has been as-
signed the hearing of claims formerly heard by ad-
ministrative boards.

Our conclusions are fortified by those of the courts
of other jurisdictions that have considered the prob-
lem.  We note that just as our declaratory judg-
ments statute confers the power to render declara-
tory judgments upon our courts of general jurisdic-
tion, that is, courts having both a "law side" and an
"equity side," so the New York declaratory judg-
ments act vests such power in its courts of similar
general jurisdiction, namely, the supreme courts of
that State.  Consonant herewith, it was stated in
*General Mutual Insurance Co.* v. *Coyle,* 207 Misc
362, 364 (136 NYS2d 43, 45): "There can be no such
action [declaratory judgment action] instituted in
the court of claims."  Since the court of claims does
not have jurisdiction to act, there is no need to con-
sider the additional issues presented to it, though our
failure to discuss the applicability of the theory of
*res judicata,* or collateral estoppel, or any other doc-

<hr>

[6] Compare CL 1948, § 691.501 (Stat Ann § 27.501), with uniform
declaratory judgments act, § 1.

[7] CL 1948, § 691.502 (Stat Ann § 27.502).

trine intended to prevent the bringing of repetitive actions over what is essentially the same cause of action, should not be interpreted as our sanction of what has been here done. See Restatement, Judgments, § 1, and §§ 41 to 72, inclusive.

The opinion of Mr. Justice BLACK, we note in closing, applies a theory plaintiff expressly disavowed to a constitutional argument plaintiff did not make to invest the court of claims with a jurisdiction it does not have. All of this is directed to the position that public officials' constitutional invulnerability to changes in salaries during their terms of office somehow or other offends the equal protection clause of the Constitution. Such conclusion is totally unsupported by applicable precedent and completely oblivious to the reasons for the adoption of the constitutional provision respecting salary stability.

We are constrained to observe that it is with considerable reluctance that we enter upon the discussion of any legal issue so intimately integrated with our own welfare as the principles applicable to the increase or reduction of judges' salaries. We share the feeling of the United States supreme court expressed in *Evans* v. *Gore,* 253 US 245 (40 S Ct 550, 64 L ed 887, 11 ALR 519), wherein the court prefaced its holding, in a case involving taxation of judges' salaries, with these words: "Because of the individual relation of the members of this court to the question, thus broadly stated, we cannot but regret that its solution falls to us. * * * But jurisdiction of the present case cannnot be declined or renounced." Here, however, the constitutional question has been intruded with the case wholly needlessly. The court of claims has no jurisdiction to render the declaratory judgment prayed, and, if it had, the most serious questions would arise as to how many times this plaintiff may litigate what is

essentially the same question, namely, his salary
claims.

We do not rule upon the position that the superior
court of Grand Rapids is a circuit court and the judge
thereof a circuit judge. The point was neither re-
lied upon nor briefed by either party to this litiga-
tion. In fact we find in plaintiff's brief in this case,
and in his prior case seeking salary adjustment, a
repudiation and disavowal of such argument,[8] for
reasons not obscure. The point had been squarely
ruled upon and properly rejected in *Dunham* v. *Til-*
*ma,* 191 Mich 688.[9]

The plaintiff, then, by his own admission, is not,
and does not claim to be, a circuit judge. In this pos-
ture of the case we did not consider, nor did any
party brief to us, the question of whether or not
plaintiff's salary deficiency if a circuit judge, and as
a circuit judge, which he was not, when compared
with the salary of a "nearby" circuit judge, involved
either a denial of plaintiff's right to equal protec-
tion under the Fourteenth Amendment of the Con-
stitution of the United States or the Constitution of
this State. Even had the question been before us,
however, it would not have been ruled upon under
the view we have taken as to the jurisdiction of the

---

[8] In referring to the case of *Dunham* v. *Tilma,* 191 Mich 688, the
plaintiff speaks as follows: "The contention of Judge Dunham was
that the judge of the superior court did come within the classification
of a circuit judge by reason of the jurisdiction given to the court.
*We make no such claim and never have.*"

The emphasis is not that of this Court but of the plaintiff.

The position thus taken is consistent with that taken in plaintiff's
former appearance before this Court respecting his salary contro-
versy. He said at that time:

"Plaintiff submits that his right to be paid a salary in the same
amount as is provided for circuit judges is not to be determined
upon the question of whether the judge of the superior court is or is
not a circuit judge. Plaintiff does not contend that he is a circuit
judge and, therefore, that he falls within the exception found in the
Constitution."

[9] See, also, *Jones* v. *Circuit Judge,* 35 Mich 494, *Heath* v. *Circuit*
*Judge,* 37 Mich 372, and *Allen* v. *Circuit Judge,* 37 Mich 474, the
latter opinion by Mr. Justice COOLEY.

court of claims, for few principles of judicial interpretation are more firmly grounded than this: a court does not grapple with a constitutional issue except as a last resort.[10] Yet, as we noted, since such constitutional issue has been intruded into the case, however gratuitously, further discussion is in order lest our silence be construed as acquiescence in the propositions asserted with respect thereto.

The adoption of the original constitutional clauses respecting changes in salaries of public officials during their terms of office resulted from interference with the independence of the judiciary through the power of the purse during Revolutionary times. This was one of the principal causes of complaint in this era.[11] The Declaration of Independence itself, setting forth the tyrannies of the English king, asserted that: "He has made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries." As a result most State constitutions, as well as the Federal, contain provisions seeking to protect judicial, or, in some cases, all public officials' salaries from alteration, in one form or another, by the legislatures.

Thus we have, in this State, a constitutional provision forbidding the increase, except for "circuit

[10] *United States* v. *Lovett*, 328 US 303 (66 S Ct 1073, 90 L ed 1252), Frankfurter, J., concurring at page 320 in these words:

"But the most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible. And so the 'Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.' Brandeis, J., concurring in *Ashwander* v. *Tennessee Valley Authority*, 297 US 288, 341, at 346 (56 S Ct 466, 80 L ed 688). That a piece of legislation under scrutiny may be widely unpopular is as irrelevant to the observance of these rules for abstention from avoidable adjudications as that it is widely popular. Some of these rules may well appear over-refined or evasive to the laity. But they have the support not only of the profoundest wisdom. They have been vindicated, in conspicuous instances of disregard, by the most painful lessons of our constitutional history."

[11] See Dickerson, American Colonial Government, 1696–1765 (1912), pp 195–209.

judges," or the decrease, of the salaries of public officers after their election or appointment.[12] Such a provision must inevitably result, in event of salary increases, in subsequent salary differences between judges, other than circuit judges, elected for non-simultaneous terms. There is no doubt, then, that an actual inequality as to salary may exist between those occupying the same office and doing the same work. But is this an unconstitutional inequality, that is to say, an inequality offensive to constitutional principles? That will depend upon the reason and purpose of the provision creating the inequality. Here the constitutional draftsmen must weigh the actual inequality conceded to exist at times against the evils conceivably attendant upon a lack of such provision. The purpose of such provisions, according to Alexander Hamilton,[13] was to restrict the power of the legislature, so that it could "neither weaken [the public officer's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice." Whether such provisions outweigh considerations of arguable injustice to public officials elected for long terms has been a matter of debate, as has the extent or severity of the clause forbidding change.[14]

---

12 Mich Const (1908), art 16, § 3.

13 The Federalist, No 73, at 457 (Lodge ed 1888).

14 The Constitution of the United States makes a distinction between the salary of the president, which can be neither increased nor diminished (US Const, art 2, § 1, cl 7), and those of the Federal judges, which cannot be diminished, probably, again according to Hamilton (The Federalist, No 79, at 492 [Lodge ed 1888]), because of "the difference in duration of the respective offices." Hamilton used these words in explanation of the restriction as to judges being in diminution only (*Id.* at 491, 492):

"It will readily be understood that the fluctuations in the value of money and in the state of society rendered a fixed rate of compensation in the Constitution inadmissible. What might be extravagant to-day, might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances, yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the

But the debate, for us, has been resolved. The constitutional provision against raising or lowering salaries is, as we have noted, a common feature of many State constitutions, including that of our State, as well as the Federal. These provisions have been a part of the several constitutions since earliest times. They have been construed again and again, as reference to any standard digest will disclose. The weakness of the novel position asserted is best demonstrated by the fact that he who asserts it, and who thus has the burden of establishing it, does not cite to us a single applicable case wherein it has been held that judges performing like functions must receive the same salaries, even though the receipt thereof must involve an increase during the term of office, in the teeth of a constitutional provision to the contrary.

This is not to say that the Constitution may not, indeed, should not, be changed. But once more we point out that we are not the body to make such change. As we said in *Stoliker* v. *Board of State Canvassers,* 359 Mich 65, 76, 77: "We are not a constitutional convention. * * * The problem we face is not how a wise Constitution would have been phrased, but whether the particular Constitution before us will be held inviolate."

The order below is affirmed. No costs, a public question being involved.

DETHMERS, C. J., and CARR, EDWARDS, and SOURIS, JJ., concurred with SMITH, J.

worse. A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation. The clause which has been quoted [US Const, art 3, § 1] combines both advantages. The salaries of judicial officers may from time to time be altered, as occasion shall require, yet so as never to lessen the allowance with which any particular judge comes into office, in respect to him."

BLACK, J. (*dissenting*).

"The evil that men do lives after them;
The good is oft interred with their bones."[0]

By the provable mistake, made here in 1955, of having looked *strictissimi* through a minute peephole at one sentence of the Constitution[1]—as if that sentence, decisively by itself, had been written in granitic terms on a Babylonian tablet—, an able and faithful judicial officer is shown in this case as having suffered a grievous injustice. Nothing short of an order for rehearing of *Taylor* v. *Auditor General,* 342 Mich 265, entered on our own resolution of atonement, will accomplish the *amende honorable.*

Under this preamble I propose to record—*spyt den duivel*—my reasons for adoption of the suggested resolution.

*First: The superior court of Grand Rapids is, in fact, a duly commissioned and steadily functioning circuit court.*

The superior court of Grand Rapids was "established" by the legislature in 1875 (by Public Act No 49 of that year[2]). At that time the authority for such legislation appeared in section 1 of article 6 of the Constitution of 1850.

"The judicial power is vested in one Supreme Court, in circuit courts, in probate courts, and in justices of the peace. Municipal courts of civil and criminal jurisdiction may be established by the legislature in cities."[3]

---

[0] Shakespeare, Julius Caesar, act 3, sc 2.—REPORTER.

[1] The reference is to the last sentence of section 3 of article 16, Const (1908), quoted hereinafter.

[2] CL 1948 and CLS 1956, §§ 727.1–727.38 (Stat Ann and Stat Ann 1959 Cum Supp §§ 27.3611–27.3648).—REPORTER.

[3] Compare the phrasing of this section with that of corresponding sections of the Constitutions of 1835 and 1908. For convenience these sections are quoted as follows:

"The judicial power shall be vested in one Supreme Court, and in such other courts as the legislature may, from time to time, establish." (Const 1835, art 6, § 1.)

"The judicial power shall be vested in one Supreme Court, circuit courts, probate courts, justices of the peace and such other courts

In 1902 this Court had occasion to compare the jurisdiction of the superior court with that of the respective circuit courts (*Nichols* v. *Judge of Superior Court,* 130 Mich 187). The question was whether the superior court, like the circuit courts, was jurisdictionally authorized to cite and punish for "subornation of perjury in a criminal case." Concluding that the legislature "did choose to give it [the superior court] all the powers which were conferred by the Constitution upon the circuit courts in all those matters intrusted to its jurisdiction" (pp 197, 198), the Court reasoned (quite properly) as follows (pp 191, 192):

"The act gives such court original and exclusive jurisdiction over all criminal proceedings committed within the corporate limits of the city, with certain exceptions, and 'power to issue all lawful writs and process, and to do all lawful acts, which may be necessary and proper to carry into complete effect the powers and jurisdiction given by this act, and especially to issue all writs and process, and to do all acts, which the circuit courts of this State, within their respective jurisdictions, may in like cases issue and do by the laws of the State of Michigan.' PA 1875, No 49, §§ 13, 14 (CL 1897, §§ 630, 631). Under this law the superior court is subject only to the control of the Supreme Court. It is governed by the same rules of practice as the circuit courts. Appeals are taken from it to the Supreme Court. In short, it is subject to the mandate of this Court in precisely the same manner and to the same degree that the circuit courts are.

"This act is similar in its provisions to the act establishing the superior court of Detroit.[4] This Court held that:

of civil and criminal jurisdiction, inferior to the Supreme Court, as the legislature may establish by general law, by a two-thirds vote of the members elected to each house." (Const 1908, art 7, § 1.)

[4] See PA 1873, No 59. The superior court of Detroit was abolished by PA 1887, No 13.—REPORTER.

" 'As respects civil jurisdiction, the superior court [of Detroit] is a tribunal of the same class as the circuit courts. There are no limitations upon its powers.  *  *  *  The nature of the subjects of its jurisdiction, so far as the jurisdiction extends, is the same. It is a court of original jurisdiction, proceeding according to the course of the common law.' *Wyandotte Rolling Mills Co.* v. *Robinson,* 34 Mich 428, 432."

The reader is requested to pause, parenthetically at this point, for reflection upon the fact (it is a part of "the public history of the times") that this case of *Nichols* was the relevant "law" and the understood "usage" during the coeval years when the Constitution of 1908 was proposed to and adopted by the people (for interpretive nexus see *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159, and that which the Court had to say, in *Renihan,* quoted *infra,* regarding the people's knowledge and intent, respecting the superior court, when they considered and adopted the Constitution of 1908). And next I suggest careful examination of the then shortly ensuing opinion in the case of *Attorney General, ex rel. Danhof,* v. *Renihan,* 184 Mich 272. There it was determined—on sound premises we now must accept or reject—that the governor, distinguished from the common council of Grand Rapids, was and is empowered to fill vacancies occurring in the office of judge of the court. *Renihan* mortars its cornerstone into place by this considered holding (p 275):

"The jurisdiction of the court [the superior court] is defined by section 13, as amended. It has original and concurrent jurisdiction with the circuit court for the county of Kent, and within its territorial limits the jurisdiction conferred is as extensive and broad as that of the circuit court."

The act of 1875 remains unchanged, in pertinent substance, to this day. It is cited officially as CL 1948 and CLS 1956, §§ 727.1–727.38 (Stat Ann and Stat Ann 1959 Cum Supp §§ 27.3611–27.3648). The court established and maintained thereby was then and is now a circuit court in all but name, and the judge thereof possesses and performs, within the territorial limits of his jurisdiction, the same powers and duties as are possessed and performed by circuit judges sitting in the respective circuits of county-wide jurisdiction. The original jurisdiction of the court was and is concurrent with that of the Kent circuit court (where it is not made exclusive); the rules of practice in the court are the same as in circuit;[5] provision is made for semiautomatic (without leave of court) transfer to it of criminal and civil causes and proceedings pending in the Kent circuit (which are within its original jurisdiction); appeals from orders, judgments and decrees of the court are taken to the Supreme Court as in the case of appeals from circuit, and the court in general is vested unconditionally with the judicial power "to do all lawful acts which may be necessary and proper to carry into complete effect the powers and jurisdiction given by this act, and especially to issue all writs and processes, and to do all acts which the circuit courts of this State, within their respective jurisdictions, may in like cases issue and do by the laws of this State." (Quotation from original and present section 13 of the act of 1875.[6])

[5] See sections 15, 16, and 17 of the act of 1875, as amended, and Michigan Court Rule No 1, § 2 (1945). Said section 2 reads:

"The provisions of these rules shall apply alike to criminal cases, except as otherwise provided by statute, to law and chancery cases and proceedings except when it clearly appears that they apply to either law or chancery cases only. They shall apply to the Supreme, circuit, recorder's and superior courts, and to circuit court commissioners, except where a restricted application is expressly provided or necessarily implied."

[6] Note that this broad and all-inclusive grant of jurisdiction was copied verbatim into section 11 of the act of 1883, establishing the re-

In terms of court administration as well as actual practice in both courts (superior court and Kent circuit court), the jurisdiction of the superior court is uniformly regarded by bench and bar as that of a circuit court. Commencing with the year 1957 the court administrator has included in each of his annual reports a separate division dealing with the functioning jurisdiction and recurrently excellent docket record of the superior court. The 1957 and 1958 reports (the 1959 report is not as yet published) pertinently read:

"In the superior court of Grand Rapids, served by one judge and having substantially the same jurisdiction as the circuit courts, more new cases were commenced and more cases were disposed of in 1957 than in 1956. In 1957, as in 3 of the last 4 years, this court has disposed of more cases than were commenced. Pending cases were the lowest in number

corder's court of Detroit. See Act No 326, Local Acts 1883, ch 12, § 11 (CL 1948, § 726.11 [Stat Ann § 27.3561]). But recently, in *In re White,* 340 Mich 140, this Court was called upon to construe such grant of jurisdiction as against contention that the recorder's court was without power to punish the appellant for contempt. Referring to the act of 1883 we said (p 149):

"Having acted thus, the court so created under constitutional authority and provision, became a constitutional court of record, possessed of the inherent powers appertaining thereto, equally as in the case of the circuit and other courts enumerated in the Constitution. It follows that the legislature has no power to deprive a constitutional court, such as a circuit court, of its power to punish for contempt committed in its presence. And, inasmuch as *the recorder's court of the city of Detroit possesses all the powers given circuit courts in the State of Michigan,* 'and to do all acts which the circuit courts of this State, within their respective jurisdictions, may, in like cases, issue and do by the laws of this State,' it also follows that the legislature has no power to deprive a judge of the recorder's court of its power to punish for contempt committed in its presence."

Such is the doctrine, recorded 39 years earlier, of *Murtha* v. *Lindsay,* 187 Mich 79, 82:

"The recorder's court is, when exercising jurisdiction to try persons accused of crimes, under the general laws of the State, a State court; its judges exercising the powers of a circuit judge. *People* v. *Jackson,* 8 Mich 78. If a vacancy in the office is filled by appointment, the appointment must be made by the governor. *Attorney General, ex rel. Danhof,* v. *Renihan,* 184 Mich 272."

since before 1946. The number of cases commenced was the highest since 1947." (1957 Report, p 29.)

"The superior court of Grand Rapids is served by one judge and has substantially the same jurisdiction as the circuit courts. This court showed a docket gain of 3% in 1958 and reduced its volume of pending cases by 4.1%, the lowest volume since before 1946. Cases pending over 2 years were reduced by 11.5%." (1958 Report, p 43.)

The only distinction between the jurisdiction and authority of the superior court, and that of a circuit court, is territorial. That is to say, the original jurisdiction of the court is limited to the boundaries of Grand Rapids; whereas the corresponding jurisdiction of our circuit courts as now composed ordinarily extends to—and includes all within—the boundaries of the county where the court is seated. But this is a distinction without a difference of substance. When the legislature carved from the jurisdiction of the Kent circuit the jurisdiction of the superior court of Grand Rapids, it merely exercised the power of alteration and creation given it by former and present Constitutions (Const 1850, art 6, § 7; Const 1908, art 7, § 8); a power it may exercise at any time with respect to any judicial circuit of the State and any court, such as the superior court, which it may have established or may hereafter establish.

I turn to the supreme court for guidance and helpful analogy. In 1932 Congress reduced percentage-wise the rate of compensation "of all judges (except judges whose compensation may not, under the Constitution, be diminished during their continuance in office)." At that time an apparently grim Irishman named Daniel O'Donoghue was an associate justice of the supreme court of the District of Columbia. The comptroller general, holding that the supreme court of the District of Columbia was a "legislative"

court and not a "constitutional" court, reduced Judge O'Donoghue's compensation and, simultaneously for the same reason, reduced the compensation of Associate Justice William Hitz, of the court of appeals of the District of Columbia. The 2 judicial officers, understandably taking not kindly to this, sued in the court of claims to recover the amount of the respective deductions as made. The court of claims thereupon certified the presented questions to the supreme court (*O'Donoghue* v. *United States*, 289 US 516 [53 S Ct 740, 77 L ed 1356]).

By its exhaustively considered majority opinion, including quotation of Chief Justice Marshall's "strong and frequently quoted language",[7] the supreme court (citing and quoting *Federal Trade Commission* v. *Klesner*, 274 US 145, 154, 156 [47 S Ct 557, 71 L ed 972]) ruled that the "parallelism between the supreme court of the District and the court of appeals of the District, on the one hand, and the district courts of the United States and the circuit courts of appeals, on the other, in the consideration and disposition of cases involving what among the States would be regarded as within Federal jurisdiction, is complete." The court then went on to say:

"In the light of all that has now been said, we are unable to perceive upon what basis of reason it can be said that these courts of the district are *incapable* of receiving the judicial power under article 3. In respect of them we take the true rule to be that they

---

[7] "The judicial department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? * * * I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people, was an ignorant, a corrupt, or a dependent judiciary." (p 532.)

are courts of the United States, vested generally with the same jurisdiction as that possessed by the inferior Federal courts located elsewhere in respect of the cases enumerated in section 2 of article 3. The provision of this section of the article is that the 'judicial power shall extend' to the cases enumerated, and it logically follows that where jurisdiction over these cases is conferred upon the courts of the district, the judicial power, since they are capable of receiving it, is, *ipso facto,* vested in such courts as inferior courts of the United States." (pp 544, 545.)

*O'Donoghue* can be read with profit by those who— for the purposes of presently considered section 3 of article 16, Const (1908)—would arbitrarily carve, from a natural class of courts of uniformly vested and commonly known jurisdiction, a court which is different only in name. Further, and since we walk perilously—in this case of Taylor—on the brink of offense to a citizen's nationally guaranteed right to equal protection of the laws, we would do well to heed the portents of *O'Donoghue* by definite ascertainment whether any nonarbitrary difference, either of jurisdictional substance or actual fact, exists between the superior court and its judge on one hand and a circuit court and its judge on the other.[8] The superior court certainly is fully "capable" of receiving, as it has by enactment and continuity to date of the act of 1875, the jurisdiction of a circuit court. And so it is a circuit court within its steadily expanding—at the expense of the Kent circuit proper—territory of jurisdiction. It is even conceivable, Constitution and statute meanwhile remaining constant, that the superior court someday will have on its hands the bulk of the total circuit court business of Kent county.

---

[8] See extended discussion of *O'Donoghue* in the respective opinions in *National Mutual Insurance Co.* v. *Tidewater Transfer Co.,* 337 US 582 (69 S Ct 1173, 93 L ed 1556).

Constantly confounding the lawyers and judges of Michigan is the too-frequent fact of parallel lines of decisions of our Court; each being in utter conflict with its competitor, and each haughtily ignoring existence of the other. Here is such an occasion. On the one hand *Dunham* v. *Tilma,* 191 Mich 688; *Mooney* v. *Unemployment Compensation Commission,* 336 Mich 344, and *Taylor* v. *Auditor General,* 342 Mich 265 (all 3 paying no attention to the words or the reasoning of *Chicago & W. M. R. Co.* v. *Nester,* 63 Mich 657; *Nichols* v. *Judge of Superior Court, supra; Attorney General, ex rel. Danhof,* v. *Renihan, supra; Landman* v. *City Commission,* 259 Mich 402, 404; *Youdan* v. *Kelley,* 267 Mich 616; *Stowell* v. *Johnson,* 280 Mich 627; *General Exporting Co.* v. *Star Transfer Line* [CCA 6], 136 F2d 329; *Star Transfer Line* v. *General Exporting Co.,* 308 Mich 86; and *Grand Rapids* v. *Ottawa Circuit Judge,* 342 Mich 287[9]), conclude as in the incredible words of *Mooney* (p 352) "that the legislature, in creating the superior court, did not invest it with all the powers and functions of a circuit court within the territorial limits of its jurisdiction"; whereas the last cited line of cases declare with good reasoning what the statute actually bestows, that is, civil and criminal jurisdiction of the superior court coequal with that of our circuit courts. To repeat the words of the statute: It confers jurisdiction "to do all acts which the circuit courts of this State, within their respective jurisdictions, may, in like cases, issue and do by the laws of this State."

---

[9] Note that this Grand Rapids decision (342 Mich 287), and the decision of *Taylor* v. *Auditor General,* 342 Mich 265, were signed and handed down on the same day (April 14, 1955). Neither makes mention of the other. The *Grand Rapids* decision copiously quotes *Nester,* cited above, to the point that the jurisdiction of circuit courts "is subject to legislative exceptions" and that the act of 1875 is valid as against claim that it unconstitutionally encroaches upon circuit court jurisdiction.

To recall *Dunham, Mooney,* and *Taylor* for re-examination it is necessary only to point out that in not 1 of the 3 opinions did the Court give consideration to the statutory language just quoted. That language was, manifestly, overlooked on all 3 occasions. *Dunham* and *Taylor* should be overruled as offensive to the constitutionally conferred power of the legislature to establish and maintain, as it has, the superior court.

As for *Mooney,* it need only be pointed out that the Court on that occasion roamed far into the daisies of dictum. Section 38 of the then unemployment compensation act,[10] which the Court was called upon to apply in *Mooney,* is an adopted rule of practice (*Love v. Wilson,* 346 Mich 327; *Darr v. Buckley,* 355 Mich 392) which is applicable only to issuance of certiorari to review decisions of the appeal board. The rule authorizes issuance of the writ solely by "the circuit court of *the county*" of residence or place of business or, under certain circumstances, by "the circuit court for *the county* of Ingham." The writ not having been issued by any such circuit court *of a county*. I perceive no reason—in *Mooney*—for inclusion in the decisional bouquet of the plucked weed of error *obiter.*[11]

What of the judge of the Court? His elective term (6 years) was and is coextensive as to length with that of each circuit judge. Compare section 4 of the act of 1875, as last amended in 1881 (by Act No 113), with section 6 of article 6 of the Constitution of 1850 and section 9 of article 7 of the present Constitution (1908). He was and is elected for such term on the same Monday in April, every sixth year, as is

---

[10] CLS 1956, § 421.38 (Stat Ann 1959 Cum Supp § 17.540).—RE-PORTER.

[11] What error? Why that of saying—contrary to an unread statute—that the legislature did *not* invest the superior court "with all the powers and functions of a circuit court within the territorial limits of its jurisdiction."

every circuit judge of the State. He was and is entitled (if the provision was and is valid) to "receive from the treasury of the State of Michigan the same annual salary as may be payable to circuit judges." Originally the statute required that such salary be "payable quarterly." Now the statute requires that such salary be "payable in the same manner as are circuit judges." (See the amendment of section 6 by PA 1949, No 275 [CLS 1956, § 727.6 (Stat Ann 1959 Cum Supp § 27.3616)].)

This brings us to the decisive question posed by plaintiff's appeal; whether during his tenure of judicial office he was entitled to the same exemption, from the ban against increase of State paid salary, as was enjoyed—during the same period—by circuit judges under the concluding sentence of section 3 of article 16 of the Constitution of 1908 ("Salaries of public officers, except circuit judges, shall not be increased, nor shall the salary of any public officer be decreased, after election or appointment.").[12]

Save only as to name, the superior court of Grand Rapids is a fully equipped circuit court of Michigan. Save only as to name, the judge of the court is, so far as judicial power is concerned, a fully commissioned and actually functioning circuit judge. It has been so since, and long antedating, adoption of our present Constitution. Suppose the legislature had designated the court as the "circuit court of Grand Rapids" and the judge of the court as the "circuit judge" of the "circuit court of Grand Rapids." This it could have done, and may now do, with undoubted sanction of the Constitution. Would it still be contended that the judge of the court is not a member. of the favored class, for the exemptive purposes of said section 3?

---

12 The attorney general concedes that *Taylor* v. *Auditor General, supra,* is not *res judicata* of this question. He does say *Taylor* is good law and is presently binding by the doctrine *stare decisis.*

The name of the superior court and its judge is a relevant nothing. It is writ in legislative water, and may be legislatively changed at any time without affecting the status or the jurisdiction of the court. What counts is the fact that the legislature has seen fit not to change the judicial powers of this court, the elective term of its judge, the order for corresponding State salary, or the jurisdictional identity of the court and its judge with the circuit courts of the counties and the judges thereof. No such change or alteration having been made during this judge's tenure of office, he may not properly—as a matter of construction of our Constitution—be denied the right of equal treatment as a member of the class of judicial officers to which he belongs in legal fact if not by appellation. Which proves that special names and legal labels alone make no distinctions of substance.

"What's in a name? That which we call a rose
By any other name would smell as sweet."*

Do I hear it claimed that the legislature cannot do what it has done (by enactment and by successive amendments of the act of 1875), that is, establish and maintain a constitutional court of record with such judicial vestments—and powers—as the Constitution and laws bestow on the circuit courts of the counties? I suggest that the answer relevantly appeared—between 1850 and 1908—in the *Nester Case, supra,* and, since 1925, that it has appeared in *City of Detroit* v. *Wayne Circuit Judge,* 233 Mich 356, 361. In the latter case it was held that "The legislature has the constitutional right to create any court and to vest it with whatever jurisdiction it pleases, provided only that it shall be inferior to the Supreme Court." This was said in the light of present section 1 of the judicial article, which section eliminated the qualifying word "municipal" (see the first section

---

* Shakespeare, Romeo and Juliet, act 2, sc 2.—Reporter.

of the corresponding article of the Constitution of 1850, quoted *infra*).

There is more to be said, if we are to construe the Constitution properly and so avoid probable denial of this plaintiff's right to equal protection under the Fourteenth Amendment. As a sort of preface to such discussion note is made of the fact that, of all salaried public officers the elective terms of whom are *fixed by the Constitution,* the terms of circuit judges only are as long as 6 years. All other salaried officers are elected—under the Constitution—for terms of 2 or 4 years. It is true, of course, that some educational officers (elected by command of article 11) have constitutionally fixed longer terms. However, each such article 11 officer holds an honorary distinguished from salaried office.

There is seen here a probable and substantial reason for the more favorable classificationary treatment, by said section 3 of article 16, of salaried officers whose constitutionally fixed greater length of elective term would, but for the exemption, preclude frequent or fairly frequent (as may be done in the case of constitutionally fixed 2- or 4-year terms) consideration by the legislature of the subject of salary increase.

*Second: For the purposes of decision sections 1 and 3, of articles 2 and 16 respectively, should be read and applied together.*

I have said that the legislature could—and so might—dub its judicial creation "the circuit court of Grand Rapids" and the judicial officer thereof "the circuit judge of the circuit court of Grand Rapids." If that should be done, after our opinions in the present case are handed down, would the attorney general still insist that the judge of the court is not a "circuit judge" within the exemption appearing in said section 3? Would not such literal and hypertechnical construction and application of sec-

tion 3 offend simultaneously adopted section 1 of article 2; the pertinent mandate of the latter being that all similarly situated—naturally classified if you will—judicial officers shall receive equal treatment under our laws? Would the presented question differ then in substance? I think not. Before us now, as I see it, is a question answerable only by unitary interpretation of 2 Gordian united parts of the Constitution, and application of such interpretation to the circumstances by which it is claimed that this judge should be denied that right all other judges of his jurisdictional class do now enjoy.

No principle of constitutional construction is better established than that simultaneously adopted and necessarily related provisions of a Constitution must be interpreted together for the purpose of ascertaining the intentional purpose of the people. Such provisions should, indeed, be construed and applied according to the rule *in pari materia*. (*Patton* v. *United States,* 281 US 276, 298 [50 S Ct 253, 74 L ed 854, 70 ALR 263].) "As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion." (*Ullmann* v. *United States,* 350 US 422, 428 [76 S Ct 497, 100 L ed 511, 53 ALR2d 1008].) Where a provision of a State Constitution is capable of 2 constructions, one of which would conflict with some provision of the National Constitution, "the other must be adopted" (11 Am Jur, Constitutional Law, § 55, p 666). The people of a State have no more right to legislate, through and by means of their Constitution, in violation of the National Constitution than they have to legislate in violation of that supreme instrument through acts of their elected representatives (*Standard Computing Scale Co.* v. *Farrell,* 249 US 571, 577 [39 S Ct 380, 63 L ed 780]).[13]

---

[13] "We recognize that the Fourteenth Amendment, as part of the supreme law of the land under Article 6 of the original Constitution,

We said, in *Renihan, supra* (p 282), "that constitutions are made for the government and guidance of the 'plain, common people,' and they should not be subjected to such technical construction as to do away with their plain provisions." Here the unitary provisions of section 1 of article 2 and section 3 of article 16 became and remain meaningfully plain before the "plain, common people" having business with or in the superior court and the nearby circuit court. Both courts, operating within the periphery of their original jurisdictions, have done and now do the same job. Both determine the same rights according to the same rules. Each grants or denies petitions for divorce; administers and enforces the criminal laws; determines liability and damages in motor accident cases; adjudges matters of contempt and child custody, and issues constitutional writs for determination before the forum thereof. Each court, within the area of its jurisdictional assignment, uniformly "comes home in its effects to every man's fireside." Thus the judge of each such court is entitled to equal treatment under our laws especially when those laws provide for such treatment.

Some here reject "a literal and technical construction" of the Constitution (*Lockwood* v. *Commissioner of Revenue,* 357 Mich 517, 559), and some do not (*Lockwood,* pp 544, 545). Some are convinced that constitutional provisions should not—cannot—be interpreted by the rules and tests courts ordinarily apply to the words and phrases of statutes, commercial documents, ambiguous wills, and other legal instruments of possible or asserted complexity (*Lockwood,* pp 564–566). And some believe in rejection, when confronted with a choice of interpretive doubt, of "that which will defeat rather than effectu-

---

supersedes 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' " (*Bute* v. *Illinois,* 333 US 640, 658 [68 S Ct 763, 92 L ed 986].)

ate the constitutional purpose" (*Lockwood,* p 569, quoting *United States* v. *Classic,* 313 US 299, 316 [61 S Ct 1031, 85 L ed 1368]). For denigration as well as elaboration of these postulates, see all opinions in *Lockwood, supra.*

Looking now at section 1 of article 2, and section 3 of article 16, it becomes our clear and present duty to give equiponderant effect to each. Neither must receive that interpretation which, in its application to the circumstances of the case at hand, will nullify or impair the other. Adverting, then, to the laws and usages of the time of adoption (*Bacon* v. *Kent-Ottawa Metropolitan Water Authority, supra*), and recalling again our firm holdings that "the equality of rights protected by our Constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution." (*In re Fox's Estate,* 154 Mich 5; *Naudzius* v. *Lahr,* 253 Mich 216, 222 (74 ALR 1189, 30 NCCA 179); *Cook Coffee Co.* v. *Village of Flushing,* 267 Mich 131), I look upon the exemption of "circuit judges," appearing in said section 3, as including all judges of that natural class of similar situation as respects jurisdiction, duty, basic State salary, coextensive elective terms, and "parallelism" of judicial power. That class includes this plaintiff judge.

When the Constitution of 1908 was considered and adopted the judge of the superior court was steadily receiving "the same annual [State] salary" as was then payable to circuit judges. He was doing work of a circuit judge by constitutionally authorized assignment to the work of a circuit judge. And, if I read *Renihan* aright, the electorate did not intend to exclude his court (and so the judge thereof) from that class upon which the judicial power of circuit courts was cast by the first section of the judicial article. The Court said, in *Renihan* (p 280):

"It is inconceivable that the framers of the present Constitution, or the people adopting it, were ignorant of, or unfamiliar with, the law defining the courts of record then in the State, or the act establishing the superior court of Grand Rapids. In naming certain courts in section 17 that should be courts of record did they intend to exclude other courts from that class which had been, or might be, created by the legislature, when by section 1 [of article 7] it had been declared that the judicial power should be vested in certain named courts, 'and such other courts of civil and criminal jurisdiction, inferior to the Supreme Court, as the legislature might establish by general law?' To ask this question is to answer it in the negative."

The only question, then, is whether the jurisdictional power and duty of the superior court is identical in law with that of our constitutionally created circuit courts. That question should, for a number of reasons already given, be answered in the affirmative. The only alternative, which I reject, is that of employment of arbitrary and artificial distinctions, the present application of which would "suffer subordination" of article 2 to article 16.

I refuse to attribute to the people, when they considered and adopted the Constitution, any iniquity or inequity of purpose, or expectation that their Supreme Court would interpret these related constitutional provisions other than by the nontechnical rules Marshall, Story and COOLEY had previously and preceptively written (see *Lockwood, supra,* pp 567–570). I would in fact say more. By approval of the Constitution the people of Michigan imposed a trust upon this Court. They have a right to trust each of us to abstain from construing simultaneously adopted provisions of the Constitution in such way as will create inequality where equality is rightfully due according to the known tests by which courts

determine the right of equal protection. Our test, which applies aptly to the case before us, appears in Michigan's leading case (12 Am Jur, Constitutional Law, § 482, pp 156, 157) of *Haynes* v. *Lapeer Circuit Judge,* 201 Mich 138 (LRA1918D 233), as follows:

"It is elementary that legislation which, in carrying out a public purpose for the common good, is limited by reasonable and justifiable differentiation to a distinct type or class of persons is not for that reason unconstitutional because class legislation, if germane to the object of the enactment and made uniform in its operation upon all persons of the class to which it naturally applies; but if it fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and denies them to others of like kind, by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition against class legislation." (pp 141, 142.)

This is the same test a State statute or constitution must pass when it is challenged—appropriately —as being offensive to the right of federally guaranteed equal protection. Applying the test here, it would seem that the application of said section 3, as ordered in *Taylor,* operates to deny each judge of the superior court the equal protection of perfectly sound statutory law. Why, then, misinterpret said section 3 into an untenable position—that of conflict with the Fourteenth Amendment? The latter "supersedes" anything in the constitution "of any State to the Contrary notwithstanding." (*Bute* v. *Illinois,* 333 US 640, 658 [68 S Ct 763, 92 L ed 986].)

*Third: Judge Taylor's right to "the same annual salary" was constitutionally fixed prior to each of his elective terms.*

When *Taylor* v. *Auditor General* was submitted and decided in 1955, no consideration was given to

the fact that the formula for determination of the amount of State salary, to be paid each judge of the superior court, was lawfully determined *prior to the elective term of each such judge.* This was accomplished by a statute which tied—continuously—the dollar-amount of the judge's State-paid salary to the dollar-amount of State-paid salary of circuit judges. That statute, having fixed the right prior to each elective term of the judge of the court, is fully effective according to its intent. It does not offend the third section of the "miscellaneous" article [16]; has never offended that section, and we should say so.

This question has been considered, thoroughly and successively, by 2 distinguished attorneys general. One is now a member of the bench of the 7th circuit. The other is a member of this Court. I refer first to the opinion of Attorney General Roth (No 1269, August 10, 1950; OAG 1951–1952, p 38).[14] There, the State-paid salary of county school superintendents was shown as having been precedently fixed according to the "fluctuating factor" of county population. It was ruled that the third section of the miscellaneous article was not violated by payment of increased salaries, during term, according to such factor. Here is the essence of the ruling:

· "In *Crowe* v. *Board of Commissioners,* 210 Ind 404, 408 (3 NE2d 76, 77), also quoted with approval in the *Guckenberger Case* [*State, ex rel. Mack,* v. *Guckenberger,* 139 Ohio St 273, 285, 286 (39 NE2d 840, 139 ALR 728)], the court said:

" 'There is no merit in the contention that an increase in the salary of an officer during his term is involved. The salary was fixed before he was elected. The amount he was to receive from time to time was made to depend upon the population of the county. It is as though the statute in existence when the officer

---

[14] The other opinion is No 2822, December 7, 1956; 2 OAG 1955–1956, p 726.

was elected had provided that he should receive $1,000 the first year and $2,000 the second year of his term. In the statute under consideration the legislature chose to make the amount of salary dependent upon population shown by the United States census. It might continue during the latter part of the term the same as before the census. It might be more if the population increased. It might be less if it decreased.'

"In my judgment this view is sound and would prevail in this State should the question ever reach our Supreme Court. Consequently, *so long as a salary, dependent in amount upon a fluctuating factor such as population, is provided for by a statute effective prior to election or appointment of any public officer such officer may receive salary increases due to changes of the salary factor without there being a violation of Const 1908, art 16, § 3.* Indeed, the salaries of judges of probate have been so determined for some time."[15]

As to superior court judges the mutable and precedently fixed factor is the during-term decision of the legislature (when such decision or decisions are made) to increase the State-paid salary of circuit judges. This is just as valid a factor as was considered in *People* v. *Riegel,* 120 Mich 78, 90, where a "no increase or decrease" statute, worded pertinently like said section 3 of the miscellaneous article [16], was construed and applied to an instance where the fluctuable amount of the defending county treasurer's

---

[15] Later, by opinion No 1284, dated August 31, 1950, OAG 1951–1952, p 61, the variable (during term) salaries of probate judges were held valid under said section 3. Attorney General Roth noted that "a majority of the jurisdictions in which the question has been decided have taken the view that such constitutional provisions do not prohibit automatic salary changes dependent upon future events if the laws so fixing salaries are seasonably enacted."

Another opinion of Attorney General Roth (No 1087, November 14, 1949; OAG 1949–1950, p 385), cited presently by the attorney general, follows *Dunham.* It does not consider the question whether the precedent fixing of salaries by a "fluctuating factor" is valid under said section 3.

salary was precedently made to depend, during his elective term, "upon the work done" (not a bad idea, at that, for selective and precedent determination of the salaries of public officers). The Court said:

"We are not satisfied that it [the statute] was intended to have the effect stated, and think that it was intended to prevent changes in salaries following the election of officers, before the beginning of or during their terms. We see no reason for saying that it was intended to abrogate section 527, or to affect it, except as it forbids changes during an official term. It is apparent that the amount of the salary fixed in this instance was indefinite and uncertain in a sense, because liable to be increased or diminished through variations in the amount of the collection fees. But the statute was designed to prevent repeated or untimely action by the board, and not to prohibit a method of fixing the salary which should make the amount contingent upon the work done, and which has already been approved, provided the resolution fixing the salary should state the rule by which the amount should be determined."

Opinion No 2822, mentioned above, considered the question whether legislation, adopted prior to election and providing a step-raised salary for a public officer, would offend said section 3 of the miscellaneous article [16]. Attorney General Kavanagh answered by quoting as above, from opinion No 1269, with conclusion as follows:

"In the case you now put, we assume that the salary is being fixed before the election or appointment of the officer. We believe that the reasoning of the prior quoted opinion applies, and that since the amount of the salary is fixed prior to his election or appointment, there is no increasing of salary within the term."

For 85 consecutive years the State-paid salary of each judge of the superior court has been fixed ac-

cording to a "fluctuating factor," which factor has taken automatic effect on the amount of the judge's salary whenever the legislature has determined to increase the salaries of circuit judges. The legislative reason and purpose sprout visibly from the fact that superior court judges and circuit court judges as a jurisdictional class are granted and assigned, by law, identical powers and duties.

Conclusion: Sorrow and desolation are mine as the veterans of this Court take heated umbrage over the "gratuitous intrusion" into this case of that which —yes, I say it—are necessarily involved public questions of construction of said articles 2 and 16 with the act of 1875; questions the same Brethren overlooked (understandably of course) as they tramped the treadmill of judicial work in 1955; questions the Court nevertheless should have raised and decided on account of effect of the decision—in *Taylor*—on the superior court and the judges thereof.

The Court erred in denying mandamus when Judge Taylor applied for the writ. This I suggest is self-evident when reflective consideration is given to the conclusion (p 269 of *Taylor's* report) that the "legislature cannot fix plaintiff's salary by reference." The legislature can fix the salary of a public officer "by reference," and may do so without offense to said section 3 provided its act is complete prior to election day. In this instance the legislature did act, "by reference," long before Judge Taylor came to the superior court bench (in 1932).

I would correct such error in the same spirit of humility as moved a majority of this Court—but recently—to self-correct another error of like yet less important kind. See *Romatz* v. *Romatz*, 355 Mich 81. There, proceeding on forthright declaration that it is more important that the Court be right than consistent (*Barden* v. *Northern Pacific R. Co.*,

154 US 288 [14 S Ct 1030, 38 L ed 992]), 4 members
of the Court joined me in firm announcement: "When
an appellate court discovers that a majority of its
members have erred, the duty of frank and corrective
avowal takes first place in the order of judicial busi-
ness." So it is that an occasional meal of crow, es-
pecially when it is partaken by confession, never
hurts any man who for a jot of eternity's time is
"drest in a little brief authority."[16] But recently 4
of us seated now here joined in putting the thought
in more elegant language, the pith of which impelled
our reporter to include it in the syllabic masthead of
*Montgomery* v. *Stephan,* 359 Mich 33: "The oath of
a justice of the Supreme Court is to do justice, not
to perpetuate error."

My Brothers note that not "a single applicable
case" has been cited to the point "that judges per-
forming like functions must receive the same
salaries." Here I cannot resist noting—for the
amusement and possible enlightenment of readers
in other States—that this is a peculiarly hearty old
wheeze of Michigan trial courts (Michigan's magnilo-
quent own, so to speak). True, it is now hoary and
shopworn. Yet it remains an occasional favorite
of elder argufiers when they have no authority, and
no reasoning of their own, with which to impress
the wide-eyed attenders of periodic assizes. I in
turn might, of equally grave mien, suggest that the
Brethren will never be able to dig up an authority
holding that judges of the same jurisdiction, doing
the same work, and designated as entitled to the
same State-paid salary, are *not* entitled to that self-
same salary.

The fact is that the area of present disagreement
has to be confined to the more than peculiar structure
of Michigan's Constitution, the like of which (with
its special exemption of circuit judges in the "miscel-

---

16 Shakespeare, Measure for Measure, act 2, sc 2.—Reporter.

laneous" article [16]) will not be found in the constitution of any other State. This my Brothers know, as I do. They know, too, that no Michigan case has dealt with the "Second" point above; that of unitary construction of these simultaneously adopted constitutional provisions. The reason, of course, is that the question has never come before the Court, on motion of the Court or otherwise. I bring it up (with submitted support of considered cases construing the act of 1875) for the same self-corrective reason as moved us to action in *Romatz;* for the same reason as moved a majority of the Court to "gratuitously intrude" the question of estoppel in *Thomas* v. *Morton Salt Co.,* 253 Mich 613; 258 Mich 231 (followed in *Dation* v. *Ford Motor Co.,* 314 Mich 152, 161 [19 NCCA NS 158]); for the reason that this Court as constitutional superintendent is continuously obliged—independently of other responsibilities—to see that the internal as well as external affairs of all "inferior courts" (and the officers thereof) are administered properly and fairly, and for the same general reasons as have led this Court in recent years to reject, vigorously and repeatedly, the English doctrine of disability at self-correction.

Surely my Brother SMITH will not object, even of innate modesty, to my crediting him with vanguard leadership of this forthright movement of recent years, and with having massed our trumpets for the sounding of its mighty hosannahs.

Appellate courts are known in law as "courts of error." Their primary task is that of correction of the errors of subordinate courts. That task, however, is by no means exclusive. Self-correction, too, is a part of the job of appellate jurisdiction. Which is to say that no mortal judge becomes free from error, even though for a time he wears the saintly robe of a State's highest Court. High court judges

do get into their legal shorts, one leg at a time every morning, just as do other correspondingly experienced and competent members of the bar (and sometimes a lot slower).[17]    They can and do make mistakes—"even as you and I".[18]  And, when they do err, their misjudgment affects many—if not countless—more than the single litigant whose case comes or has come to divagated decision.  That is the real reason—the effect of discovered error on unrepresented others whose relevant rights may or may not have ripened—why *some* judges of high courts are quick to swallow pride, in favor of candid confession, when such confession is due.    Such acts of self-generated compunction are, however, quite rare. Oracular pride usually carries her stubborn if tattered banner to the grave.

The root of today's discord lies in the fact that this writer again is unwilling to "go along" with the self-stultification of monolithic *stare decisis* (see all opinions of *Park* v. *Employment Security Commission*, 355 Mich 103).[19]    This time our majority grants no leave to proceed as in *Thomas, Park,* or *Romatz.* But this Supreme Court of Michigan is no military establishment.    Its official rules and regulations— embodied in the judicial article—suggest no "by your leave" writing of judicial opinions.    Much to the contrary, each of us is oath-bound to dissent, in writing, where dissent is due.[20]    And, whether dissent

---

[17] "The judiciary has no pre-eminent claim to infallibility, and so long as judges are but men, they must continue to be subject to all the infirmities which waylay and beset the rest of mankind.   We can find no sanctuary in any utopian theory from the ills and imperfections of human agency."  (Mr. Justice GRAVES in *People, ex rel. Detroit & Howell R. Co.,* v. *Salem Township Board,* 20 Mich 452, 503 [4 Am Rep 400].)

[18] Kipling, Vampire.—REPORTER.

[19] "We are by no means unmindful of the salutary tendency of the rule *stare decisis,* but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error and the advantages of review." (Cooley, Constitutional Limitations [5th ed], note to page 65.)

[20] "Any justice dissenting from a decision shall give the reasons

is debatably due or not, the Constitution makes the dissenter the sole judge of that issue. So it was in the beginning, is now and—I hope—ever shall be.

I have progressed with purposeful resolution to the point of "no return." Now this dissent must become brutally plain. The place of *stare decisis* in the area of constitutional law is "more tenuous" than in other fields.[21] In this instance, realizing as I do that an earlier decision—of constitutional construction and application—is indefensible even by clever wordsters, I refuse to let the signers thereof do my thinking for me. When a decision in that area has slithered visibly to signature by the easy path of copied ophiologic, I believe it should receive forthright re-examination with or without motion of a party (see to the point of self-correction, *sua sponte, United States* v. *Ohio Power Co.*, 353 US 98 [77 S Ct 652, 1 L ed 2d 683]). We "expound" a Constitution, as Marshall tells us. He tells us never to forget the oath-bound truism (*M'Culloch* v. *Maryland*, 17 US 316, 407 [4 L ed 579]). So does Mr. Justice Douglas:

"The place of *stare decisis* in constitutional law is even more tenuous. A judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written. But he

---

for such dissent in writing under his signature." (Const 1908, article 7, § 7.)

21 "The doctrine of *stare decisis*, however appropriate and even necessary at times, has only a limited application in the field of constitutional law." Justice (later Chief Justice) Stone, Justice Cardozo concurring, in *St. Joseph Stock Yards Co.* v. *United States,* 298 US 38, 94 (56 S Ct 720, 80 L ed 1033).

"But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this court has often overruled its earlier decisions. The court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." Mr. Justice Brandeis, dissenting, in *Burnet* v. *Coronado Oil & Gas Co.*, 285 US 393, 406–409 (52 S Ct 443, 76 L ed 815).

remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it.  *  *  * He cannot do otherwise unless he lets men long dead and unaware of the problem of the age in which he lives do his thinking for him." 49 Columbia Law Review, 735, 736.

In a way, these "intrusions" become as watchdogs (I use the noun advisedly) of the judicial process at the appellate level.   They tend to neutralize the known suspicion that some high courts, burdened as this one has been for several decades, do turn out occasional "one-man opinions," the nature and vice of which Chief Justice Vanderbilt [New Jersey] exposed so fearlessly the year of his untimely passing.[22]   Too much unanimity of viewpoint, when the common duty is independent appraisal of the always-difficult questions of law which steadily confront appellate courts, is bound to be questionable.   I would allay that suspicion whenever, in my judgment, it becomes necessary to disagree on the record with my learned Brothers.

I would re-examine *Taylor* in particular.   *Taylor* followed *Dunham* when care would have disclosed that *Dunham* considered a pivotally different situation; one where *local authorities* (unarmed with any law, ordinance, or resolution made effective prior to election day) did attempt in violation of said section 3 to raise Judge Dunham's *locally paid salary.* Following *Dunham* thus blindly, the Court ignored the one case extant which on identical facts considers

---

[22] "The greatest bane of appellate courts today, in my judgment, is the so-called 'one-man' opinion.   I am referring to the situation where an opinion purports to be the decision and reflect the thinking of all of the judges on the appellate court but which in fact represents the view and work essentially of just one of the judges.   Of all the defects in our appellate practice it is the most insidious for the simple reason that few lawyers or judges and virtually no laymen are even aware that it exists."   26 Cincinnati Law Review (1957, No 2), p 257.

the precise point dealt with in division "Third" above (*Blakeley* v. *People, ex rel. Madden,* 104 Colo 206 [89 P2d 1015]). There the salary of the plaintiff judge was precedently tied, "as to amount, to the salary of district judges." Syllabus #2 (Pacific) succinctly marshals the facts and presents the ruling:

"The constitutional provision prohibiting a change in salary of a public officer during his term did not preclude a judge of juvenile court of city and county of Denver from receiving an increase in salary during term, where statute in force at time of election provided such judge should receive a salary of not less than that received by a district judge of the county and a subsequent act increased a district judge's salary, since people knew salary of a judge of juvenile court was fixed by reference to salary of a district judge when constitutional provision was adopted."

Since the attorney general concedes that *Blakeley* "supports plaintiff's present position," and since *Blakeley* was cited to the Court when *Taylor* came to argument (January 4, 1955),[23] it seems to me that judges who are sensitive about "intrusions" should welcome an opportunity—by rehearing of *Taylor*—to explain why on former occasion they chose to disregard such a pat case; exclusively pat because the corresponding constitutional provision was adopted in each instance at a time when the judicial salary in question *had already been tied, to the permissibly increasing salaries of other judges, by a mature act of the legislature.*

---

[23] Starting on page 15, the then plaintiff's brief devoted 6 full pages to discussion and quotation of this ruling case of *Blakeley*. *Blakeley* was in fact *the* authority on which Judge Taylor relied in seeking mandamus. Yet *Blakeley* was totally ignored by this Court. Like the unwanted stray cat it has not gone away, and now it bodaciously—as well as "gratuitously"—intrudes our sacred quarters.

*Taylor* affects—adversely and unjustifiably—the rights of the judge of the superior court of Grand Rapids (no matter who he was or may be in the course of judicial succession). It does so as the territorial jurisdiction of that court—and so the burdens of its judge—expands ever deeper and at quickening pace into the hinterlands of Kent county. I would in these circumstances order that *Taylor* [*Taylor* v. *Auditor General,* 342 Mich 265] be reheard, meanwhile holding this appeal in abeyance.

KAVANAGH, J. (*concurring*). I concur in the opinion of Justice SMITH insofar as he affirms the granting of the motion to dismiss on the theory that the court of claims does not have jurisdiction to render declaratory judgments.

I further concur in his statement that there is no need to consider the additional issues presented to us, though our failure to discuss the applicability of *res judicata* or collateral estoppel, or any other doctrine intended to prevent the bringing of repetitive actions over what is essentially the same cause of action, should not be interpreted as our sanction of what had been here done.

KELLY, J., concurred with KAVANAGH, J.